# IN THE SUPREME COURT OF IOWA

No. 13–1606

Filed April 25, 2014

**IN THE INTEREST OF J.S. & N.S.,** Minor Children,

**A.S.,** Mother,
     Appellant,

**STATE OF IOWA,**
     Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Julie A. Schumacher, District Associate Judge.

The State seeks further review of a court of appeals decision that reversed, in part, an adjudication of two children as children in need of assistance. **DECISION OF COURT OF APPEALS AFFIRMED; JUVENILE COURT ORDER AFFIRMED IN PART AND REVERSED IN PART.**

David A. Dawson, Sioux City, for appellant mother.

Thomas J. Miller, Attorney General and Bruce L. Kempkes, Assistant Attorney General, and Diane M. Murphy, Sioux City for appellee State.

Chad C. Thompson of Thompson, Phipps & Thompson, Kingsley, for appellee father.

Tobias Cosgrove, Sioux City, attorney and guardian ad litem for minor children.

**MANSFIELD, Justice.**

This case requires us to determine whether a parent's status as a methamphetamine addict, without more, is enough to support a juvenile court's determination that the parent is "imminently likely to abuse or neglect the child," where "abuse or neglect" means "physical injury suffered by a child as a result of the acts or omissions of the child's parent." *See* Iowa Code § 232.2(6)(*b*), (42) (2013). We have no difficulty concluding under a separate statutory provision that a parent's methamphetamine addiction by itself can result in "harmful effects" to the child, thereby justifying state intervention to protect the child. *See id.* § 232.2(6)(*c*)(2). However, the present appeal concerns imminent likelihood of physical injury. Because we conclude that the parent's addiction by itself is not sufficient to establish such a likelihood of injury, we affirm the decision of the court of appeals and reverse in part the order of the juvenile court.

## I. Background Facts and Proceedings.

Ashley is the mother of nine-year-old N.S. and five-year-old J.S. On April 2, 2013, the Iowa Department of Human Services (DHS) received information that Ashley was "using methamphetamines intravenously while caring for her daughters." That day, a DHS child protection worker met Ashley at her apartment in Sioux City.

The worker found the residence clean and appropriately furnished. Ashley appeared to be very nurturing with the daughter, J.S., who was present. During the interview, Ashley explained she had recently moved to Iowa from Nebraska. J.S. was living with Ashley, but N.S. was staying with Ashley's mother in order to attend school in South Sioux City, Nebraska. Ashley reported that she previously had a job at a retail store,

but acknowledged that after she and J.S. became ill, she was fired for missing too much work.

Ashley admitted past methamphetamine use. According to Ashley, she used methamphetamine before N.S. was born. Afterward, she claims she did not use the drug for seven years. In 2012, she relapsed. Ashley admitted that Nebraska authorities had removed her children from her care due to her methamphetamine usage. After she successfully completed the Women and Children's Center program with the children, they were returned to her. She completed the program in September 2012.

Ashley further admitted that she deteriorated again in March 2013. According to Ashley, she used methamphetamine over a weekend while spending time with people she should not have been around. Ashley told the DHS worker that N.S. and J.S., however, were with their grandmother at the time, and Ashley claimed not to have used methamphetamine around N.S. and J.S. Ashley also said that when she did use methamphetamine, she did so by smoking it, not injecting it.

Despite phone calls and attempted visits to Ashley's apartment in the following weeks, DHS workers were unable to meet with Ashley again until May 21. On that date, Ashley came to the DHS office at DHS's insistence and met with DHS staff. Ashley explained that she had been staying with her boyfriend in South Dakota for about a month and that she was without her cell phone or a car. She said that both daughters were staying with her mother and stepfather. Ashley expressed a desire that they remain with her mother and stepfather, who would "take good care of the children." She expressed concern about her children "going through this again," and said she was worried about N.S., who had a lot of anxiety.

During the interview, Ashley acknowledged she had used methamphetamine as recently as a week ago. The child protection worker also observed emotional displays by Ashley. Ashley was angry, laughing, or crying at times throughout the interview. The worker noted she was "not sure what to attribute this to, her usage or an emotional reaction to the situation." Ashley consented to a drug test which came back positive for methamphetamine, amphetamine, cannabinoids, and carboxy-THC.[1] Staff members who administered the drug test suspected Ashley was under the influence at the time of the test because "she appeared extremely scattered."

The next day, the DHS child protection worker met with N.S., J.S., and their maternal grandmother at the grandmother's home in South Sioux City. The home was spacious, clean, and appropriately furnished. N.S. and J.S. were neatly groomed and in clean clothes. The grandmother expressed significant concern about Ashley's ongoing drug use. She explained that when she is at her part-time job, she puts the children in day care.

On June 14, the child protection worker spoke with Ashley over the telephone. Ashley explained she had visited the children at their grandmother's home, with their grandmother supervising the visits. Ashley said their grandmother had offered to become N.S. and J.S.'s guardian, but Ashley was willing to do whatever was necessary to get N.S. and J.S. back in her care. Toward that end, Ashley claimed to have

---

[1]The State argues for the first time on appeal that Ashley's test results were consistent with daily methamphetamine use, citing expert testimony in an unpublished Texas appellate case and a commercial website known as www.testcountry.com. These sources cannot be used to fill in gaps in the State's proof below. We do agree the record demonstrates that Ashley was an active methamphetamine addict who was in need of treatment at the time of the CINA proceeding.

changed her phone number and severed some relationships. She also conveyed her willingness to go to inpatient treatment if recommended.

The DHS worker concluded there was "sufficient credible evidence to indicate that Denial of Critical Care, specifically Failure to Provide Proper Supervision[,] has occurred." In support of this finding, the child protection worker noted:

> Even if [Ashley] was not caring for [N.S. and J.S.] at the time of her use, risk exists in caring for a child when coming down from methamphetamines.
>
> Parents who are addicted to methamphetamines are not available to their children because under the influence of meth there is an initial high that an individual perceives and very soon after that high comes a downfall or depression, which is very much more severe with methamphetamine than other drugs of abuse. When that happens many meth using adults will fall asleep, and that period can last for hours at a time. In that period of time, they're not capable of providing supervision and care for young children around the household.
>
> Methamphetamine is also a drug that stimulates the sensory nerve system and it also blocks the higher centers that are responsible for the checks and balances of impulses. Perceptions of danger and reasoning ability are hindered from ongoing meth use, so that over a period of time an adult using methamphetamine loses (his/her) capacity to function on a daily basis because of a lack of comprehension of what the risks [are] in the environment, what the children's needs [are] on a day-to-day basis because they don't have the energy level to provide for those needs. And also, because of the poor impulse control and increased risk of losing their temper and anger, the children in an environment where parents use meth are at an increased risk of physical abuse.

As later noted by the court of appeals, this passage is almost a direct quotation from our opinion in *State v. Petithory*, 702 N.W.2d 854, 857–58 (Iowa 2005). There we were quoting an expert witness's testimony in Petithory's criminal trial. *See id.*

The DHS report also concluded that it was "certainly not reasonable nor prudent [for Ashley] to use illegal drugs, given the fact that she is the primary caretaker of her children."

In early July, Ashley completed an evaluation at a recovery center and began intensive outpatient drug treatment. In a meeting with DHS on July 9, Ashley stated she did not want to go through the Women and Children's Center program again, because it was "very hard on the children." She admitted she had been hanging around with the wrong crowd again.

In mid-July, Ashley relapsed. A report dated August 22 indicated Ashley had "made little to no progress in the last 30 days" and had tested positive for methamphetamine, amphetamine, and opiates. Ashley denied using opiates. Ashley had attended only eight of the twenty-six days scheduled for group sessions and still needed to have an individual session to "create her treatment plan." The discharge plan noted she was "recommended for inpatient treatment . . . followed by halfway house placement," and further recommended she continue with services for eight to twelve months. On August 27, Ashley was admitted to a residential drug treatment program.

The State filed a petition on July 31 alleging N.S. and J.S. were children in need of assistance (CINA) under Iowa Code sections 232.2(6)(*a*), (*b*), (*c*)(2), and (*n*).[2] On August 30, the juvenile court held a

---

[2]Section 232.2(6)(*a*) involves a child "[w]hose parent, guardian, or other custodian has abandoned or deserted the child." Iowa Code § 232.2(6)(*a*).

Section 232.2(6)(*b*) involves a child "[w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Iowa Code § 232.2(6)(*b*).

Section 232.2(6)(*c*)(2) involves a child

hearing. Ashley resisted adjudication under Iowa Code sections 232.2(6)(*b*) and (*n*). The parties waived a formal record. No witnesses were called. Ashley did not object to admission of the State's nine exhibits, and no other evidence was presented.

On September 5, the juvenile court filed an order adjudicating N.S. and J.S. CINA under Iowa Code sections 232.2(6)(*a*), (*b*), and (*c*)(2). The juvenile court declined to adjudicate the children under Iowa Code section 232.2(6)(*n*).

On September 30, a dispositional hearing was held. The parties again waived a formal record, no testimony was heard, and with the exception of two additional exhibits submitted by the State, no new evidence was presented. The court ordered that N.S. and J.S. be placed with their maternal grandmother.

Ashley filed a notice of appeal on October 11. Ashley challenged only the CINA determination under Iowa Code section 232.2(6)(*b*). We transferred the case to the court of appeals. The court of appeals reversed, with one judge dissenting. It held the State failed to meet its burden of proving N.S. and J.S. should be adjudicated CINA under Iowa Code section 232.2(6)(*b*). The State sought further review, which we granted.

---

> [w]ho has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.

Iowa Code § 232.2(6)(*c*)(2).

Section 232.2(6)(*n*) involves a child "[w]hose parent's or guardian's mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care." Iowa Code § 232.2(6)(*n*).

The adjudication under section 232.2(6)(*a*) was sought only as to the children's father.

## II. Standard of Review.

We review CINA proceedings de novo. *In re K.B.*, 753 N.W.2d 14, 15 (Iowa 2008). In reviewing the proceedings, we are not bound by the juvenile court's fact findings; however, we do give them weight. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (en banc).[3] Our primary concern is the children's best interests. *Id.* CINA determinations must be based upon clear and convincing evidence. Iowa Code § 232.96(2).

## III. Discussion.

Ashley raises only one issue on appeal: Did the juvenile court correctly find that N.S. and J.S. are children in need of assistance under Iowa Code section 232.2(6)(*b*)? Although Ashley does not contest the CINA determination under section 232.2(6)(*c*)(2), that does not render the present appeal moot. The grounds for a CINA adjudication do matter. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995) ("The underlying grounds of adjudication in child in need of assistance cases have important legal implications beyond the adjudication."). For example, a CINA determination under section 232.2(6)(*b*) may lead to termination of parental rights under section 232.116(1)(*d*), whereas a CINA determination under section 232.2(6)(*c*)(2) cannot. *See* Iowa Code §§ 232.2(6)(*b*), 232.2(6)(*c*)(2), 232.116(1)(*d*). In other words, adjudication under section 232.2(6)(*b*) may result in parental rights being terminated before the statutory time periods in sections 232.116(1)(*e*), 232.116(1)(*f*), or 232.116(1)(*h*) have passed. *See In re J.E.*, 723 N.W.2d 793, 801–02 (Iowa 2006) (Cady, J., concurring specially) (discussing the importance of statutory deadlines for reunification).

---

[3]We note, however, that in the present case, the juvenile court made its decision based upon written exhibits that were stipulated into evidence. There were no credibility findings.

Under Iowa Code section 232.2(6)(*b*), the CINA adjudication requires a determination that a "parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." But "physical abuse or neglect" and "abuse or neglect" are terms of art in this context. Within chapter 232, "physical abuse or neglect" and "abuse or neglect" mean "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child." *Id.* § 232.2(42).[4]

We have explained "physical injury to the child is a prerequisite" to finding *past* physical abuse or neglect. *See In re B.B.*, 440 N.W.2d 594, 597 (Iowa 1989) (observing the definition of neglect under chapter 232 requires a finding of physical injury). Nothing in the record indicates N.S. or J.S. suffered a physical injury. Therefore, N.S. and J.S. cannot be adjudicated CINA under section 232.2(6)(*b*) based on previous abuse or neglect, and the State concedes as much.

The only issue, therefore, is whether the record demonstrates by clear and convincing evidence that N.S. or J.S. were "imminently likely" to suffer a nonaccidental physical injury. Here we agree with the views of the court of appeals. True, Ashley's admitted methamphetamine use, her repeated positive drug tests, and her relapses indicate she is an active methamphetamine addict. Furthermore, the record establishes that the children have suffered or are imminently likely to suffer

---

[4]As the court of appeals put it, these are "statutorily-defined phrases having a narrow definition."

"harmful effects" as a result of Ashley's failure to exercise a reasonable degree of care in supervising them. *See* Iowa Code § 232.2(6)(*c*)(2).

Although chapter 232 does not contain a definition of "harmful effects," we have noted it "pertains to the physical, mental or social welfare of a child." *In re Wall*, 295 N.W.2d 455, 458 (Iowa 1980). Because of this broad definition, we have found such effects established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur. *See In re B.B.*, 440 N.W.2d at 597–98 (finding the State proved the parents' failure to exercise a reasonable degree of care when a child's lack of attendance at school "adversely affected his educational, social, and emotional development"); *In re J.S.*, 427 N.W.2d 162, 165 (Iowa 1988) (finding harmful effects as a result of a failure to exercise a reasonable degree of care in supervising children given that a child was playing outside on the street while the parents' home was locked and a child was "very aggressive and uncontrollable"). Hence, a juvenile court could reasonably determine that a parent's active addiction to methamphetamine is "imminently likely" to result in harmful effects to the physical, mental, or social well-being of the children in the parent's care. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) (noting "an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children").

It is telling that Ashley's own mother was so concerned about the effects of Ashley's drug addiction that she felt it necessary to personally supervise Ashley's visits to her own children. Ashley admitted the consequences of her methamphetamine addiction were hard on the children. Being shuttled back and forth from grandparents during episodes of drug intoxication, or when Ashley decided to stay with her boyfriend in South Dakota for a month, is disruptive to a child's

emotional health and well-being. Clearly, the section 232.2(6)(*c*)(2) determination was appropriate here.

Having said all that, we do not believe general statements about methamphetamine addiction are enough by themselves to prove that a child is imminently likely to suffer physical harm under section 232.2(6)(*b*). *See* Iowa Code § 232.2(6)(*b*), (42). In this case, from what we can tell on this record, a grandparent was willing and able to step in and relieve Ashley of parenting duties when she was not up to the task. As a result, the children were well-groomed, well-dressed, well-fed, and generally well-cared for while at their grandmother's. To some extent, what happened here is analogous to what occurs when a parent falls ill or becomes disabled and leaves her or his children with a relative. We would rather have parents who are grappling with untreated addiction rely on the services of a relative than do nothing, and so it seems unfair not to take that into consideration at all.

We can contrast this case with *Petithory*, where the defendant had no parental surrogate. *See* 702 N.W.2d at 855. In that case, while coming down from a methamphetamine high, the defendant fell asleep after putting his infant daughter in the bathtub with the water running, an episode that resulted in his daughter's drowning. *Id.* It is possible that N.S. and J.S. may have been exposed to similar dangers, notwithstanding the availability of Ashley's mother, but a general statement about methamphetamine's deleterious effects is not enough to meet the State's burden. Indeed, in *Petithory* we stressed that the conviction for criminal neglect was not based "purely upon [the defendant's] *status* as an illegal drug user" and that "[t]he particular circumstances of this case, buttressed by expert testimony regarding the

[e]ffects of meth addiction and its concomitant dangers," supported the finding of guilt. *Id.* at 859–60.

Although the phrase "imminently likely" is used three times in the definition of "child in need of assistance," the term "imminent" is not defined in Iowa Code chapter 232. *See* Iowa Code § 232.2(6)(*b*)–(*d*). When the legislature leaves a term undefined, we may look to this court's decisions, other courts' decisions, dictionary definitions, similar statutes, and common usage to define the term. *Schaefer v. Putnam*, 841 N.W.2d 68, 78 (Iowa 2013). Relying on a dictionary definition, we have defined "imminent" for purposes of our self-defense statute to mean " 'ready to take place,' 'near at hand,' 'hanging threateningly over one's head,' and 'menacingly near.' " *State v. Shanahan*, 712 N.W.2d 121, 142 (Iowa 2006) (citing *Webster's Third New International Dictionary* 1130 (unabr. ed. 2002)). Relying on this same definition, we explained in another case that "imminent" means a threatened act "is impending or about to occur." *State v. Lane*, 743 N.W.2d 178, 182 (Iowa 2007). "Imminent" has also been defined to mean "on the point of happening." *Black's Law Dictionary* 750 (6th ed. 1990).

Case law supports a liberal interpretation of the phrase "imminently likely" in the CINA context. In *In re D.D.*, an eight-year-old boy was adjudicated a child in need of assistance under Iowa Code section 232.2(6)(*d*) because the juvenile court found he was " 'imminently likely to be sexually abused' by his father." 653 N.W.2d 359, 361–62 (Iowa 2002). The father had admitted climbing into the bathtub and encouraging his nude ten-year-old daughter and her female friend "to soap his chest and stomach and then slide down his body." *Id.* at 360–61. The boy denied his father had ever bathed with him or touched him. *Id.* at 360. Nevertheless, because of the incident with the two girls and

the boy's vulnerability to sexual abuse, this court found the boy to be in imminent danger of sexual abuse. *See id.* at 362.

In another case, we upheld an adjudication of a child as one in need of assistance because we found the child "imminently likely to be abused or neglected by her mother or maternal grandparents." *In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994). The grandparents had been involved in numerous instances of physical and sexual abuse with others. *See id.* at 873. The mother had been convicted of assault and had been hospitalized because she threatened to harm herself. *See id.* at 873–74. She also failed to cooperate with mental health treatment and failed to pursue Title XIX coverage despite being urged to do so by a social worker. *See id.* at 874. Finally, the mother was an admitted alcoholic and drug addict. *Id.* We concluded the child could not be safely parented by either the mother or the grandparents. *Id.*

*D.D.* and *A.M.H.* establish that under Iowa Code section 232.2(6), we do not require neglect or physical or sexual abuse to be on the verge of happening before adjudicating a child as one in need of assistance. Nor should we require that showing. Child protection statutes "are designed to prevent probable harm to the child and do not require delay until after harm has occurred." *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990).

Even so, in both *D.D.* and *A.M.H.* there were specific prior instances of sexual or physical abuse committed by a caregiver. In *D.D.*, the father's previous sexual contact with his daughter and her friend put his son at risk of future sexual abuse. *See* 653 N.W.2d at 362. In *A.M.H.*, several founded sexual and physical abuse reports against the grandparents contributed to the risk of future abuse of the child. *See* 516 N.W.2d at 873–74. Unlike in those cases, here the State failed to

prove any specific prior incidents of abuse or neglect. Its case was based on the general characteristics of methamphetamine addiction, and for section 232.2(6)(*b*) purposes, we do not believe that is automatically enough to establish an imminent likelihood of physical harm to the children.

## IV. Conclusion.

For the foregoing reasons, we reverse the order of the juvenile court finding N.S. and J.S. to be children in need of assistance under Iowa Code section 232.2(6)(*b*). We affirm the juvenile court's order in all other respects. We affirm the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AFFIRMED; JUVENILE COURT ORDER AFFIRMED IN PART AND REVERSED IN PART.**

All justices concur except Cady, C.J., and Zager, J., who dissent.

**CADY**, **Chief Justice (dissenting).**

I dissent separately to emphasize an important point. The standard and burden for the State to prove a child is in need of assistance under the enumerated definitions in the juvenile justice chapter of the Iowa Code do not differ depending on the length of time parents are subsequently given to eliminate the parenting deficiencies that resulted in the adjudication before an action for termination of parental rights may proceed. *See* Iowa Code §§ 232.2(6), .96(2) (2013). The grounds for termination of parental rights are a separate legislative determination from the question whether a child is in need of assistance. *See id.* § 232.116.

Unfortunately, the mother in this case is a methamphetamine addict who, despite recovery efforts, continues to fall victim to her addiction. Her addiction, as supported by the stipulated evidence in the case, renders her undependable while using methamphetamine and while coming down from the drug. This fact is a serious problem because she is also the parent of two young children, one four years of age, who depend on her.

The mother admitted her circumstances supported a finding that her children are "imminently likely to suffer harmful effects as a result of" her failure "to exercise a reasonable degree of care in supervising" her children. *Id.* § 232.2(6)(*c*)(2). I submit those same circumstances also mean her children have a mother who "is imminently likely to . . . neglect" them. *Id.* § 232.2(6)(*b*). The failure of a parent to adequately supervise a four-year-old child due to a methamphetamine addiction necessarily places the child at risk of suffering a nonaccidental physical injury. *See id.* § 232.2(42).

The State was entitled to an adjudication of child in need of assistance under both grounds, even though one may give a parent a more limited window of time to recover from her addiction.

**ZAGER, Justice (dissenting).**

I respectfully dissent. The majority's review of the record is thorough, so I will recount it only as necessary. However, I disagree with the majority's conclusion N.S. and J.S. are not children in need of assistance under Iowa Code section 232.2(6)(*b*) (2013).

This court has rarely had the opportunity to apply the different provisions of Iowa Code section 232.2(6), under which a child may be adjudicated CINA because the child is "imminently likely" to be the victim of abuse or neglect. We have done so in only two cases, *In re D.D.* and *In re A.M.H.* *See generally In re D.D.*, 653 N.W.2d 359 (Iowa 2002); *In re A.M.H.*, 516 N.W.2d 867 (Iowa 1994). In those cases, we found specific prior instances of sexual or physical abuse supported the finding the children were "imminently likely" to be neglected or physically or sexually abused.

However, I do not believe we should let the specific facts at issue in those cases control the resolution of this case. Nothing we said in those cases indicated that a lack of specific previous instances of abuse or neglect foreclosed a CINA adjudication on the basis that a child was imminently likely to be abused or neglected. Moreover, the plain language of section 232.2(6)(*b*) does not require the State to prove the occurrence of specific previous incidents of abuse or neglect to show the risk of future abuse or neglect. *See* Iowa Code § 232.2(6)(*b*). Nor should the State be required to prove that abuse or neglect has already occurred before acting to protect children under these statutes. As the majority notes, child protection statutes "are designed to prevent probable harm to the child and do not require delay until after harm has occurred." *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990); *see also* Iowa Code § 232.1

(requiring liberal construction of child protection statutes to serve children's welfare).

I would conclude, after a de novo review of the record, there was clear and convincing evidence showing Ashley was imminently likely to abuse or neglect N.S. and J.S. were the children returned to her care. This conclusion is based upon more than the mere classification of Ashley as a methamphetamine addict and the excerpt from *Petithory* contained in the DHS report. *See State v. Petithory*, 702 N.W.2d 854, 857–58 (Iowa 2005).

The record tells the story of Ashley's continued inability to parent her children due to her unabated drug use. Ashley has relapsed multiple times since the children were removed from her care in Nebraska in 2011. Even after DHS became involved in Iowa, she continued her drug use and tested positive for multiple drugs twice since April 2013. The hair-follicle test conducted in May found the presence of methamphetamine at 7890 picograms per milligram. Ashley did not dispute the State's claim that this amount is consistent with daily use. Throughout these proceedings, Ashley continually denied using and minimized her drug use. In mitigation, Ashley claims that she never used drugs in front of her children or while she was responsible for their care. In July, Ashley commenced out-patient drug treatment. However, in a progress report dated August 22, it was noted that "Ashley has made little to no progress in the last 30 days. Ashley admitted to services on July 9, 2013, and has been present 8 out of 26 days scheduled for group." The progress report also noted that a drug test on August 14 was positive for methamphetamine, amphetamine, and opiates, although Ashley denied using any opiates. This report is dated eight days before the scheduled adjudication hearing.

As the drug tests reveal, Ashley used not only methamphetamine but also other drugs. In addition to methamphetamine, she was also variously ingesting amphetamine, cannabnoids, carboxy-THC, and opiates. The use of multiple controlled substances paints a picture of an individual who will ingest anything available to get high. Ashley was simply not capable of stopping her usuage of drugs until she entered inpatient treatment.

The record also reveals that without the discipline provided by inpatient treatment, Ashley was incapable of avoiding the use of drugs. Ashley had previously completed inpatient drug treatment in September 2012. The apparent impetus for Ashley entering treatment on that prior occasion was, like in this case, the removal of her children from her care. According to Ashley's mother, Barbara, Nebraska child welfare authorities removed N.S. and J.S. from Ashley's care because of her drug addiction. Ashley reported relapsing six months after completing treatment, though Barbara believed Ashley relapsed as soon as two months after completing treatment. Regardless of when Ashley relapsed, it is clear she did so after leaving the supervision of treatment. This history of use followed by treatment, abstinence, and relapse indicates more than a prolonged struggle with drugs. It portends future relapse, future drug abuse, and future treatment, and thus more risk and disruption to her children. *Cf. L.L.*, 459 N.W.2d at 494 (noting a parent's past is a consideration in child protection cases because that past performance may indicate future capabilities).

Without profound change, Ashley's past indicates that she will again abuse methamphetamine. This makes especially relevant a portion of the DHS report. According to the report, which takes its language from *Petithory*, "ongoing methamphetamine use" hinders reasoning

ability, causing users over time to lose their "capacity to function on a daily basis because of a lack of comprehension of what the risks in the environment [are], [and] what the children's needs on a day-to-day basis [are]." It is not merely speculation or conjecture that Ashley's daily methamphetamine use likely has diminished her reasoning ability, which impairs her ability to care for N.S. and J.S.

Evidence suggests Ashley's use causes her other behavioral problems that put her children at risk as well. The DHS child protection worker reported Ashley behaved erratically during an interview. Ashley laughed, cried, and displayed anger, which, the child protection worker noted, could have been caused by Ashley's methamphetamine use. When Ashley reported that same day for a drug test, drug test facility workers described Ashley as "scattered," which led them to believe she was under the influence of drugs, even though Ashley claimed to have used a week earlier. Subsequent drug testing confirmed the inaccuracy of Ashley's representation.

Ashley's behavior during the interview and in front of the testing facility workers indicates the sort of erratic, perhaps careless, behavior to which she could subject her children. Moreover, Ashley's displays discredit her claims that after relapsing in March she used methamphetamine rarely before beginning to use each day sometime in July. As the State suggests, there would not have been such a high concentration of methamphetamine in her system were Ashley only an infrequent user. Importantly, contrary to what Ashley claims, she may have relapsed before March. Barbara believed Ashley may have resumed using in November 2012, just two months after completing a prior placement in residential drug treatment. Ashley, we may safely conclude, concealed the full extent of her drug abuse.

In spite of Ashley's early drug abuse, the record indicates N.S. and J.S. were receiving adequate care. In fact, Barbara reported that N.S. and J.S. were in good health; the DHS report indicated Ashley was "meeting the physical needs of the children." The report also describes Ashley's residence as "clean" and "appropriately furnished." The child protection worker observed Ashley combing J.S.'s hair and dressing her. She described Ashley as "very nurturing." However, it must also be awknowledged that N.S. was already in the full-time care of Barbara, and J.S. followed shortly thereafter.

I do not doubt that in times of sobriety Ashley may be a capable mother. But as noted, Ashley has to this point struggled to maintain sobriety. When she is under the influence, or descending from a high, she subjects N.S. and J.S. to the risk of being abused or neglected. As the report noted, J.S. is particularly vulnerable to mistreatment, being just four years old at the time of the report. *Cf. D.D.*, 653 N.W.2d at 361–62 (concluding father's past sexual conduct with his daughter and son's vulnerability supported adjudication of the son as a child in need of assistance).

Moreover, much of the children's good health can be attributed to Barbara, with whom both children were staying much of the time due to Ashley's drug use and living arrangements. Notably, Barbara indicated N.S. and J.S. were due for a doctor's appointment. In addition, Barbara told the child protection worker she had "secured daycare for the children." These statements suggest Barbara had already assumed much of the children's care. We long ago held a child who does not receive proper care from his or her parent is a neglected child, even if a grandparent provides excellent care to the child. *See State ex rel. Gering v. Bird*, 250 Iowa 730, 732, 736–37, 96 N.W.2d 100, 101, 103–04 (1959)

(affirming a juvenile court's finding that a child was a "neglected child" in relation to her father even though the child had been well cared for by her grandparents).

In this regard, I disagree strongly with the majority's suggestion that a parent afflicted with drug addiction might avoid having his or her children adjudicated CINA by passing off the children to a relative. In Ashley's case, the availability of her mother and stepfather to care for N.S. and J.S. undoubtedly protected the children from the worst effects of Ashley's addiction; however, it also enabled her to go right on using methamphetamine. Combined with the apparent frequency of Ashley's drug use, one could easily conclude that Ashley's motivation in voluntarily turning over her children to her parents was to make using methamphetamine easier.

The fact a parent has been a drug addict or alcoholic is not alone a sufficient basis for adjudicating a child as a child in need of assistance. *J.B.M. v. Dep't of Children & Families*, 870 So. 2d 946, 951 (Fla. Dist. Ct. App. 2004) (concluding that without an actual harm or injury "as a consequence of a parent's alcohol or drug use, evidence that the parent has a drug or alcohol problem, standing alone, is insufficient to support a finding of dependency"); *In re William B.*, 533 A.2d 16, 19 (Md. Ct. Spec. App. 1987) ("Mere alcoholism of the parents is not grounds under the statute for removing a child from his home with his parents."); *In re Children of T.R.*, 750 N.W.2d 656, 663 (Minn. 2008) (holding "substance or alcohol use alone does not render a parent palpably unfit" to parent); *Cf. In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (observing "that a parent's 'lower mental functioning alone is not sufficient grounds for termination.'" (quoting *In re D.W.*, 791 N.W.2d 703, 708 (Iowa 2010)). In

contrast, in this particular case, at the time of the adjudication hearing, Ashley was an active, untreated methamphetamine user.

On a related note, appellate review in this case was complicated by the terse adjudication order. Legal analysis in CINA determinations is particularly important to the appellate courts given the undeniable expertise of juvenile judges in handling these difficult cases. For that reason, and a host of others, juvenile courts are reminded that when there are contested grounds for adjudication before it, appellate review is much more effective with the benefit of the juvenile court's full, fair, and adequate explanation of its legal conclusions. *See* Iowa Code § 232.96(7) ("After the hearing is concluded, the court shall make and file written findings as to the truth of allegations of the petition and as to whether the child is a child in need of assistance."). This ensures courts at all levels are acting in the children's best interests.

In sum, I would conclude, after a full review of the record, the State proved by clear and convincing evidence that N.S. and J.S. were children in need of assistance under Iowa Code section 232.2(6)(*b*), as Ashley was imminently likely to abuse or neglect the children. Each time Ashley climbs up from addiction, only to descend again, she disrupts her children's lives. Her drug abuse jeopardizes their health, safety, and welfare. As we have said in the context of parental rights termination, "Children simply cannot wait for responsible parenting." *L.L.*, 459 N.W.2d at 495. Toward that end, we have explained "that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children." *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012). I would vacate the decision of the court of appeals and affirm the order of the juvenile court in its entirety.

Cady, C.J., joins this dissent.