In the Interest of K.L.C., K.L.C. and
K.K.B., Children;

F.W., Natural Mother, Appellant.

No. 84–1316.

Supreme Court of Iowa.

July 31, 1985.

Steven R. Walters, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Sp. Asst. Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee, State of Iowa.

Considered by REYNOLDSON, C.J., and HARRIS, LARSON, SCHULTZ and CARTER, JJ.

SCHULTZ, Justice.

The natural mother, F.W., appeals the termination of her parental rights with respect to her three children: K.L.C. (a son born November 18, 1976); K.C. (a daughter born September 28, 1978); and K.K.B. (a daughter born·January 8, 1982). She asserts: (1) she was denied due process because the judge who presided at the termination hearing was not the same judge who issued the termination order; and (2) the State failed to establish grounds for termination by clear and convincing evidence.

A child abuse report completed in May 1981 was substantiated. Physical conditions in F.W.'s home were unsatisfactory. Floors, walls and furniture were grimy; food, beer cans, dirty dishes, and clothes were strewn throughout the house; the house was infested with roaches; and a full potty chair sat in the living room. The investigator found that F.W.'s emotional instability and alcohol abuse adversely affected her ability to care for the children.

A second child abuse report was prepared in February 1982; reports of both sexual abuse and denial of critical care were substantiated. K.L.C. and K.C. both reported they had been subjected to oral sexual abuse by their mother's boyfriend. Both children had their sex organs physically injured without any reasonable explanation. The children stated they had witnessed their mother and her boyfriend engaged in sexual intercourse and were able to demonstrate intercourse with anatomically correct dolls. Physical conditions in the home were consistent with the previous substantiated abuse report. F.W.'s acquaintances had been involved in fights in her home which led to police involvement, including one incident in which an acquaintance fired a shot into the home. These occurrences had resulted in a life-threatening situation for the children. Shortly before his removal from the home, K.L.C. (the son) had threatened his mother with a knife. F.W. was not taking the baby to medical appointments and, on at least one occasion, ran out of formula for the infant, feeding K.K.B. sugar water until a social worker delivered more formula.

On February 26, 1982, K.L.C. and K.C. were taken into protective custody by the Department of Social Services [1] and placed in foster care at the home of a relative. F.W. had already delivered K.K.B. to that relative's home requesting the baby be hidden from the authorities. K.L.C. and K.C. were admitted to St. Joseph's Mental Health Institute for evaluation and treat-

---

1. The title was changed to the Department of Human Services effective July 1, 1983. 1983 Iowa Code Supp., Code Editor's Preface.

ment in March. They returned to the foster home following their release. K.L.C. (the son) has made significant improvements in controlling his aggressive behavior since being placed in foster care.

Numerous services have been made available to F.W. including homemaker assistance, day care, counseling, parenting classes, and group counseling for adults who were victims of sexual abuse. F.W. has consistently refused these services or participated half-heartedly. After the children were placed in foster care, F.W. sold her home. She lived in a trailer for a short period of time. During the months preceding the termination hearing she lived in numerous places with different relatives.

F.W. was 28 years old when her children were removed from her home. The boyfriend who sexually abused the children was a teenager. Their relationship ended shortly after the children were placed in foster care. A second boyfriend, who was seventeen years old, assisted F.W. with the rent payments on the trailer. A third teenage boyfriend, M.W., was the father of a baby born to F.W. on July 6, 1983. This infant was terminally ill and died on September 11, 1983. On September 20, 1983, F.W. married M.W. A hearing on the petition for termination of parental rights was held on October 17, 1983, before a juvenile judge who retired without ruling on the case. Judge G.T. Reilly was assigned the case and entered the order terminating F.W.'s parental rights on July 13, 1984.

I. *Due process.* The mother asserts "that there was error in that the judge who presided at the termination hearing was not the same judge who issued the final termination offer"; she contends she was denied due process of law. The basic elements of due process of law are notice and an opportunity to defend. *Carr v. Iowa Employment Security Commission,* 256 N.W.2d 211, 214 (Iowa 1977). Due process requirements are not technical. "Due process of law guarantees 'no particular form of procedure; it protects substantial rights.'" *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 610, 94 S.Ct. 1895,

1901, 40 L.Ed.2d 406, 415 (1974) (quoting *NLRB v. Mackay Co.,* 304 U.S. 333, 351, 58 S.Ct. 904, 913, 82 L.Ed. 1381, 1393 (1938)). The Supreme Court listed several factors that require consideration in examining procedures:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

We agree with the mother that the relationship between parent and child is constitutionally protected under the fourteenth amendment to the United States Constitution. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511, 519–20 (1978). Thus, there is a significant private interest. In this case we find little risk of erroneous deprivation of such interest, however. The mother was accorded a full hearing during which all procedural safeguards were protected. Judge Reilly examined the entire record in this case, including testimony, voluminous exhibits, and notes of the presiding judge before rendering his decision.

The crux of the mother's complaint is that the judge who decided her case did not view the witnesses. Without totally discounting the importance of having a fact finder present during the production of evidence, especially in passing on the credibility of individual testimony, several reasons cause us to reject this contention. The State, as *parens patria,* along with other litigants in a juvenile termination proceeding, have a legitimate interest in having a child's future decided promptly without undue delay. As a fiscal

matter, the litigants have a significant interest in avoiding the time and expense of a second proceeding when the first proceeding provides a record that is complete. As a practical matter every appeal causes a final decision to be rendered without personal contact with the witnesses. On appeal, we review parent-child terminations de novo, adjudicating rights anew. *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981). Finally, Judge Reilly followed authorized procedure to decide this case. Pursuant to Iowa Rule of Civil Procedure 367(b) a substitute judge may render a decision based upon review of the transcript following death or disability of the judge who took the matter under advisement, if the substitute can "sufficiently inform himself to render a decision." We have long authorized a substitute judge to render a decision based on the record in equitable proceedings under our common law. *Hull v. Chicago, Burlington & Pacific Railroad Co.*, 65 Iowa 713, 715–16, 22 N.W. 940, 941 (1885); *see State v. Wrage*, 279 N.W.2d 4, 6 (Iowa 1979). After balancing the aforementioned factors, we conclude the mother is not denied due process.

■ II. *Clear and convincing evidence.* In its petition the State alleged two grounds for terminating parental rights, and the termination order contained findings adverse to the mother on each ground. If one of these grounds is established by clear and convincing evidence, the termination will be upheld. *In re Kelley*, 262 N.W.2d 781, 785 (Iowa 1978) (citing *In re Robbins*, 230 N.W.2d 489, 491 (Iowa 1975)). We find clear and convincing evidence exists requiring termination on the basis of Iowa Code section 232.116(5) (1983).

■ Terminating parental rights pursuant to section 232.116(5) necessitates reference to Iowa Code sections 232.96 and 232.-102 (1983). We have interpreted a termination pursuant to these Code sections requires that the child has been adjudicated in need of assistance, has been placed out of the parent's custody for more than twelve months, and there is clear and convincing evidence that the child will suffer harm specified in section 232.2(5)[2] if returned to the parent. *See Dameron,*[3] 306 N.W.2d at 745. Consequently, a section 232.116(5) termination may only take place when the child cannot be returned to the parental home because definitional grounds of a "child in need of assistance" still exist.

The mother has conceded that the children have been adjudicated in need of assistance and have been placed out of her custody for more than twelve months. Therefore, the remaining issue is whether the State has established by clear and convincing evidence that the children will suffer harm specified in section 232.2(5) if returned to F.W. Section 232.2(5) provides in pertinent part:

5. *"Child in need of assistance"* means an unmarried child:

. . . .

b. Whose parent, guardian or other custodian has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.

c. Who has suffered or is imminently likely to suffer harmful effects as a result of:

. . . .

(2) The failure of the child's parent, guardian, or custodian to exercise a reasonable degree of care in supervising the child.

d. Who has been sexually abused by his or her parent, guardian, custodian or other member of the household in which the child resides.

. . . .

f. Who is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior to-

---

2. Iowa Code section 232.2(5) (1983) has been renumbered section 232.2(6) (1985).

3. *Dameron* interpreted the termination of parental rights pursuant to Iowa Code section 232.114(5) (1979) which is now section 232.-116(5) (1983).

ward self or others and whose parent, guardian, or custodian is unwilling or unable to provide such treatment.

    *g.* Whose parent, guardian, or custodian fails to exercise a minimal degree of care in supplying the child with adequate food, clothing or shelter and refuses other means made available to provide such essentials.

■ The mother concedes there are five provisions of section 232.2(5) under which the children could possibly be found in need of assistance. We designate these as: 1) neglect pursuant to (b); 2) lack of supervision pursuant to (c)(2); 3) sexual abuse pursuant to (d); 4) in need of treatment pursuant to (f); and 5) failure to provide essentials pursuant to (g). Iowa Code § 232.2(5) (1983). However, she claims the State failed to meet its burden of proof necessary for termination under these provisions. Although proof by clear and convincing evidence of any *one* of the types of harm delineated in section 232.2(5) is sufficient to support termination, *see Dameron,* 306 N.W.2d at 745, evidence supporting termination under *each* of the five provisions is overwhelming in this case.

■ 1. *Neglect.* Clear and convincing evidence supports finding F.W. would be likely to neglect her children if they were returned to her. The neglectful actions leading to the children's removal arose when F.W. lived in her own home. Since the children were removed, F.W. has lived a transient existence. Following the children's removal she lived with at least two teenage boyfriends, subsequently marrying one of them. At the time of the hearing, F.W. had not established a home for the children. She had been living in different homes with various relatives and, as a result, would have even less control over the children's environment than when she lived in her own home.

F.W. contends that the Department of Human Services "made no effort to determine [her] present living conditions." However, she moved several times during the year without informing her case worker of her whereabouts. Although family members testified as to F.W.'s ability to care for their children, we do not find this testimony persuasive. F.W.'s mother, E.R., testified that F.W.'s child care abilities were "real good." However, E.R. also related a long history of her involvement with juvenile authorities concerning nine of her own ten children; the tenth child was only five years old at the time of this testimony.

We agree with the trial court's assessment of F.W.'s testimony: F.W. "appears to be very certain that the services offered to her have not influenced her to change, that she does not feel a need to change, and that she can parent the minor children to the best of her ability, she being the only judge of what her abilities are." Considering the severity of F.W.'s prior neglect of her children and her failure to make significant changes in her life-style the year the children were out of her home, we find clear and convincing evidence of a likelihood of neglect if the children were returned to their mother.

■ 2. *Supervision.* Clear and convincing evidence was offered to show that the children would be imminently likely to suffer harm due to F.W.'s failure to exercise reasonable care in supervising them if returned to her home. Evidence shows that F.W. tolerated sexual abuse of her children. Many adults were temporarily a part of her household. As a result, the children's sleeping arrangements were often altered. Although F.W. continues to deny knowledge of sexual abuse and refuses to acknowledge that it occurred, both her inconsistent explanations regarding how her son's penis was bruised and the children's knowledge of the intimate details of F.W.'s sexual activities contravene her assertions. Her previous failure to supervise the children together with her refusal to acknowledge any supervision problems present clear and convincing evidence that F.W. would not be able to supervise the children in a reasonable manner if she regained custody.

■ 3. *Sexual abuse.* The State presented clear and convincing evidence that the children would be in danger of sexual abuse if returned to F.W. She has tolerated sexual abuse of her two eldest children. F.W. presented inconsistent or questionable explanations of injuries to both her son's and her daughter's sex organs. She has allowed numerous relatives and friends access to her children, including a teenage male friend who is the only person known to have abused the children. F.W. has permitted her children to observe her own intimate sexual experiences; despite their tender age the children have been able to relate those details to counselors. At an early age her son has demonstrated sexually inappropriate behavior toward his sister.

Despite a long history of sexual abuse in F.W.'s family, including sexual abuse of F.W. by her own father and brother, F.W. has refused efforts to help her through individual counseling and an adult discussion group comprised of sexual abuse victims. Although F.W. argues that sexual abuse would not occur in the future because the former abuser is no longer a part of her life and her new husband would not abuse the children, F.W. has continued to live in households with many other people, including one household in which she acknowledged the occupants used drugs. Clearly, there has been little change in the circumstances under which her children were abused and in which she tolerated that abuse. Therefore, it is likely sexual abuse would recur if the children were returned to F.W.

■ 4. *Treatment.* Evidence shows that F.W.'s son will continue to need treatment for emotional problems. Although her elder daughter, K.C., was not undergoing therapy at the time of the termination hearing, evidence supported a finding that if K.C. was required to see F.W. on a regular basis, K.C. would need therapy to help cope with her feelings toward F.W. Evidence showed a long history of F.W.'s failure to keep appointments, both for herself and her children. Although she was

able to care for a seriously ill infant, the infant was in her custody for only a short period of time before death. We find clear and convincing evidence of a likelihood that these children would need treatment, but would not receive treatment if F.W. regained custody.

■ 5. *Failure to supply essentials.* F.W. has failed to provide a minimal degree of care in supplying her children with adequate food, clothing and shelter. F.W.'s home was in a very unsanitary condition. On at least one occasion she ran out of infant formula and substituted sugar water, even though she had been instructed that the substitution may be harmful to the child. The children were observed to be improperly dressed and F.W. was unable to potty train them. Day care was provided for the children, with day care workers even entering her home to dress the children. Homemaker and nursing services were furnished. Although these numerous services were provided to F.W., she was still unable to maintain a safe, healthy environment for her children or to properly care for them. Despite the life insurance money received from her infant's death and her new husband's income, F.W. did not procure permanent housing for her family; she instead chose to live with numerous relatives in crowded housing conditions. Clear and convincing evidence exists in the record to show that if the children were returned to F.W., F.W. would likely fail to exercise minimal care in providing the essentials to her children.

In summary, the State need only establish by clear and convincing evidence that the children cannot be returned to their mother's custody for one of the reasons stated in section 232.2. We find that the State has met its burden overwhelmingly by establishing five reasons why the children cannot be returned to their mother.

■ We find clear and convincing evidence in the record to establish grounds for terminating the parental rights. Additionally, we find that the seriousness of the child neglect and sexual abuse coupled with the mother's refusal to cooperate with ef-

forts to help remedy these problems overcomes the presumption that the best interest of the children requires they be returned to their mother. Thus, we affirm the juvenile court's termination of parental rights.

AFFIRMED.