# IN THE COURT OF APPEALS OF IOWA

No. 15-1692
Filed February 10, 2016

IN THE INTEREST OF A.J., A.J., A.J., AND A.J.,
Minor Children,

T.J., Mother,
Appellant.
_____

Appeal from the Iowa District Court for Polk County, William A. Price, (adjudication) and Susan Cox, (disposition), District Associate Judges.

A mother appeals the dispositional order entered by the juvenile court continuing the children's removal from the mother's custody. **AFFIRMED.**

Karen A. Taylor of Taylor Law Offices, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Bruce Kempkes, Assistant Attorney General, for appellee State.

Karmen R. Anderson of The Law Office of Karmen Anderson, Des Moines, attorney for minor child, A.J.

Michelle R. Becker of Youth Law Center, Des Moines, attorney and guardian ad litem for minor children, A.J., A.J., and A.J.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

The mother of four children appeals from the juvenile court's dispositional order continuing placement of the children out of her custody and with the Iowa Department of Human Services (DHS). The juvenile court essentially found the mother was unable or unwilling to address drug issues in her home. On our de novo review, we affirm the court's order.

### I. Background Facts and Proceedings.

At issue in this case are the mother's children, born in 2001, 2005, 2006, and 2012, respectively. The children lived with the mother and her husband, R.J., who is also the father of the three youngest children, at the husband's residence.[1] It is alleged that the husband sold a confidential informant heroin from the home at least three times between February and April of 2015. Thereafter, Des Moines Police Department's Vice/Narcotics Control Section's investigators

> conducted a search warrant at [the home]. . . . Multiple witnesses . . . identified the south bedroom as [the mother and her husband's] bedroom. Investigators found a pistol, approximately 48 grams marijuana, approximately 48 tablets hydrocodone, approximately 15 tablets of lorazepam in the south bedroom [and the master bathroom]. [The husband] took ownership of the marijuana, but no one took ownership or was able to provide prescriptions for the [hydrocodone] or lorazepam.
>   In addition to the drugs, investigators also found a working digital scale and packaging. No drug tax stamps were affixed to any packaging.

Cocaine residue was also found in the lid of a coffee grinder, on a burnt spoon, and in a plastic baggie in the home. Over-the-counter sleep aids, known to be used with cocaine as cutting agents, were also found. $690 was found in the

---

[1] R.J. does not appeal from the juvenile court's dispositional order.

husband's pocket. The room where the drugs and gun were found does not have a door or a lock, and therefore the children could access the room. However, the gun was in a locked safe, to which the children did not have access.

Following the search and seizure, the husband was arrested, and both the mother and husband were ultimately charged with drug offenses. The mother was charged with unlawfully: acting with, entering into a common scheme or design with, or conspiring with one or more persons to create, deliver, or possess with intent to deliver hydrocodone, a schedule III controlled substance, in violation of Iowa Code section 124.401(1)(c)(8) (2015), a class "C" felony; manufacturing, delivering, or possessing with intent to manufacture or deliver lorazepam, a schedule IV controlled substance, in violation of section 124.401(1)(d), an aggravated misdemeanor; and two counts of failing to affix a drug stamp, in violation of section 453B.12, a class "D" felony. Her criminal charges are still pending.

After the search warrant was executed, it was reported to DHS that drugs and a gun had been found in the home. A DHS child-protective worker contacted law enforcement officials, and an officer told the worker about the seized items found in the family's home and stated the items were "consistent with [a] family that was actively dealing drugs." The officer also advised the worker the children would have had access to the illegal substances in the home.

The worker then went to the home to assess the children's safety, and the mother was uncooperative, though the worker had explained to the mother the purpose of her visit. The worker had to call law enforcement to aid her in her

safety check. The worker was then able to determine the children were safe and were going to stay with their maternal grandmother. The mother agreed to DHS's safety plan of continuing the children's placement with their grandmother, but she noted on the plan she "personally [had] no concerns for [her] children's safety." The oldest child was later placed with her biological father, not at issue here, and the youngest children were placed in the care of their grandmother.

From the get-go, the mother has disputed the criminal charges against her. She believes the home was illegally searched in violation of her Iowa and United States constitutional rights, and at every step of the way she has resisted DHS's and the juvenile court's involvement in her family's life following the seizure of drugs at her home, including the initiation of child-in-need-of-assistance (CINA) proceedings. She and the caseworker have regularly butted heads. She and the grandmother also reportedly caused some issues with the hair taken from the children at the lab for drug testing. Three of the children's hair-stat tests were deemed inconclusive because insufficient hair was gathered. However, the eldest child's hair tested positive for cocaine. The DHS child-abuse reports were determined to be founded based upon the positive drug test and the parents' failure to provide proper supervision.

Following the State's filing of a CINA petition, along with the mother's motion to return the children to her care, a hearing was held. The mother did not assert her Fifth-Amendment privilege and testified. Her testimony evidenced her to be a smart and educated woman that loves her children. Yet, she testified she did not believe her children were or had been in harm's way. She testified she did not believe the children tested positive for any illegal substances and

someone provided DHS "with false information from an incompetent lab" and that "the testing that was performed was invalid." She also testified her eldest child had had dental work, wherein the child received a shot of novocaine and had lidocaine applied topically. She also testified the eldest child had colored her hair recently, and she asserted this and the dental work could be the reasons the child tested positive for cocaine—not the cocaine residue found in the home. She testified she did not know how the hydrocodone pills ended up in a different prescription bottle, and she suggested law enforcement officers had switched the prescriptions or had planted the evidence in her home. She would not concede that the children had been exposed to marijuana or cocaine, but she testified if they had been, it "could be" a risk.

The adjudicatory hearing was not completed that day, and it was continued to a later date. However, at the end of the first day, the court ruled upon the mother's motion requesting the children be returned to her care. On the record, the court denied the mother's motion, stating:

> As to changing the placement and returning custody of all four children or the remaining three children to the mother, in my fourteen years as a judge, in my forty-three years as a lawyer, I have seldom, if ever, seen someone who has demonstrated less insight into what brought these children before the court than their mother.
> Clearly, drugs were removed from this house. Clearly, drugs had been in this house.
> This court does not question the results of the drug tests, which are supported, on the children, which are supported by what was removed from the house.
> This court also notes that the only reason that some of these tests could not be confirmed is that the mother interfered with the amount of the sample of the hair.
> This court believes that there is no condition or combination of conditions that the court believes that would allow these children to exist in safety in the custody of their mother at this time.

Should the mother choose to engage in services at some point in the future, should the mother accept the fact that—Well, for lack of a better term, should the mother accept reality, the court could see these children at some point returning to the mother's custody. But the court did not find the mother's testimony credible on any material issues in this matter.

After the CINA proceeding concluded, the court entered its order adjudicating the children CINA and continuing their placement out of the family's home. The court found the "mother in her testimony and her actions demonstrated virtually no insight into what is necessary to protect her children," and it concluded placement outside of the parental home was necessary for this reason, as well as the parents' pending drug-related criminal matters, to ensure the children's safety.

The CINA dispositional hearing was held in September 2015, and the State, the oldest child's attorney, and the youngest children's guardian ad litem recommended the court adopt DHS's case permanency plan, continuing DHS and court involvement, as well as the placement of the children outside the home. The mother, her therapist, her substance-abuse evaluator, and the family safety, risk and permanency (FSRP) service provider that supervised her visitation with the children testified.

The mother testified she had continued seeing her therapist and had proactively started providing samples for urinalysis testing at the agency where she had her substance-abuse evaluation completed. All of her tests done at the agency were negative for illegal substances and supervised by her substance-abuse evaluator. The FSRP service provider testified the visits went well and recommended transitioning to semi-supervised visitation. All of the mother's

witnesses hedged on whether the mother had been completely honest with them; each admitted they had learned different things after the fact or from others. For instance, the mother's therapist testified that when he got the legal information from the mother's attorney, he learned the mother "was in a lot more trouble than what [he] knew, and that's going to obviously change things with how we're going to interact." The mother's therapist was asked about the Minnesota Multiphasic Personality Inventory (MMPI), and he described it as "a long psychological test . . . that is a very good way to determine if anyone has a mental condition." When asked if completing the MMPI would be a benefit to the mother to ensure there were no other mental issues being missed, the mother's therapist answered, "Yes."

Again, the mother was hesitant to answer whether or not she believed the children would be in danger if they were in a home with drugs; the following exchange occurred on the mother's cross-examination by the oldest child's attorney:

> Q. How . . . many drug tests have you taken at [DHS's] facilities? A. None.
> Q. None. Okay. And do you believe that your children being in a home where drugs are, that that would be a danger to them? A. I could see possibly how that could occur.
> Q. Okay. Do you see that children being in a home with drugs is dangerous? A. I can acknowledge that I could see how that could be dangerous.
> Q. And I'm not asking you if you can acknowledge or you can see. I'm asking if you believe that it's dangerous for children to be in homes with drugs. A. And as I just said, my answer is not going to change, so please move to your next question.
> Q. Okay. It's a yes or no question. A. I answered your question. I said I could acknowledge that that could be a problem.
> Q. Okay. So are you acknowledging that it's a problem? A. I am acknowledging that it could be a problem.

Q. Do you see it as a problem in your case?  A. In my case, no, I don't. . . .  I was unaware of something, so how can I see it as a problem if I'm unaware of something?  And if it was never around me or my children, how can I see it as a problem?

Q. But being in the same home with your children is around your children; right?  A. Yes and no.

Q. Well, they live with you, don't they?  A. They do.

Q. Did you keep a lock on your bedroom door?  A. No.

Thereafter, the juvenile court entered its dispositional order adopting DHS's case permanency plan, with some modifications.  The court praised the parents for raising wonderful, amazing children, but it ultimately found the mother's inability to accept that drugs were found in the home and her children were exposed to them, as well as the mother's lack of transparency, to be a safety concern.  It also found her substance-abuse evaluator was not credible.  The court ordered that the mother was to immediately receive at least one additional semi-supervised visit per week.  The court also directed the mother to take the MMPI and share the results with the relevant parties, explaining the information the MMPI would provide was "important to evaluate the mother's capacity to know about the drug issues in the home.  It is also important in providing relevant, supportive services."  The court also directed the mother to obtain a new substance-abuse evaluation, provide drug screens at an approved facility, and participate in family therapy.  The court ordered that "[n]o one shall attempt to influence what the children disclose or discuss in therapy," noting that there was "an indication that at least one of the children [was] concerned about talking regarding their family.  It is in the children's best interest that they freely discuss all issues in therapy."  The court further ordered that after the mother obtained an MMPI, a new substance-abuse evaluation, and provided two

consecutive negative drug screens at the approved facility, the court should be notified by the parties so it could "evaluate whether the children can be returned to their mother's care." The court found this disposition was the least restrictive one that was appropriate under the circumstances.

The mother now appeals, arguing: (1) the State failed to show at the dispositional hearing by clear and convincing evidence that the children's custody must be transferred from the mother; (2) the court failed to make the least-restrictive disposition in not returning the children to the mother's custody; (3) the court failed to make and file written findings as to its reason for the disposition; and (4) the court erred in directing the mother to complete the MMPI.

## II. Standard of Review.

CINA proceedings are reviewed de novo. *See In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). Nevertheless, we give the juvenile court's fact findings weight in our review, especially its credibility determinations, though we are not bound by them. *See id.*; *see also* Iowa R. App. P. 6.904(3)(g). The State has "the burden of proving the allegations by clear and convincing evidence," Iowa Code section 232.96(2), which "is evidence that leaves no serious or substantial doubt about the correctness of the conclusion drawn from it." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002) (citation and internal quotation marks omitted). As in all CINA matters, our fundamental concern is the best interests of the children. *See In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014); *J.S.*, 846 N.W.2d at 40.

## III. Discussion.

The parent-child relationship is constitutionally protected. *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 233

(1972); *State v. Iowa Dist. Ct.*, 828 N.W.2d 607, 615 (Iowa 2013); *In re K.L.C.*, 372 N.W.2d 223, 226 (Iowa 1985). Additionally, "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Notwithstanding:

> The protection of children is one of the most well-established duties and public policies of the State of Iowa. The State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. Both DHS and the juvenile court have the important function of protecting children who are in need of assistance.

*In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (alterations, internal citations, and quotation marks omitted).

In light of these competing interests, the legislature has directed chapter 232 be "liberally construed to the end that each child under the jurisdiction of the court . . . receive, *preferably* in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state." Iowa Code § 232.1 (emphasis added); *see also A.M.*, 856 N.W.2d at 373. Thus, "[w]e afford a rebuttable presumption that the best interest of a child is served when custody is with the natural parents," *In re N.M.*, 491 N.W.2d 153, 156 (Iowa 1992), and "[w]henever possible the court should permit the child to remain at home." Iowa Code § 232.102(5)(a). But it is the juvenile court's duty to intervene and remove children from the care and custody of parents, either temporarily or permanently, when necessary. *See A.M.*, 856 N.W.2d at 376. If children are removed from their home, DHS must "make every reasonable effort" to return them to their home as quickly as possible consistent with their best interests. Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). Yet,

children are not entitled to perfect parents. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky*, 455 U.S. at 753.

**A. Dispositional Order.**

Because the mother's first three issues are related, we choose to address them together.

Following a dispositional hearing, Iowa courts are required to "make the least restrictive disposition appropriate considering all the circumstances of the case," and it is to "make and file written findings as to its reason for the disposition." Iowa Code § 232.99(4), (5). The possible dispositions which the juvenile court may enter are set forth in sections 232.100 to 232.102, in order from least to most restrictive. *See id.* § 232.99(4). The least restrictive disposition permits the court to suspend judgment, with the child remaining with the parent. *See id.* § 232.100; *Iowa Dist. Ct.*, 828 N.W.2d at 615. Section 232.102 sets forth the most restrictive disposition—transferring the legal custody of the child to someone else, such as DHS, a relative, or another suitable person. In making its dispositional determination, the court "should permit the child to remain at home with the child's parent, guardian, or custodian" wherever possible, and it should only transfer custody of the child when it finds clear and convincing evidence that the child "cannot be protected from physical abuse without transfer of custody" or "from some harm which would justify the adjudication of the child as a [CINA] and an adequate placement is available."

Iowa Code § 232.102(5)(a). Moreover, in selecting transfer of custody as the disposition:

> [T]he court must make a determination that continuation of the child in the child's home would be *contrary to the welfare of the child,* and shall identify the reasonable efforts that have been made. The court's determination regarding continuation of the child in the child's home, and regarding reasonable efforts, including those made to prevent removal and those made to finalize any permanency plan in effect, as well as any determination by the court that reasonable efforts are not required, must be made on a case-by-case basis. The grounds for each determination must be explicitly documented and stated in the court order. *However, preserving the safety of the child is the paramount consideration.* If imminent danger to the child's life or health exists at the time of the court's consideration, the determinations otherwise required under this paragraph shall not be a prerequisite for an order for removal of the child. If the court transfers custody of the child, unless the court waives the requirement for making reasonable efforts or otherwise makes a determination that reasonable efforts are not required, reasonable efforts shall be made to make it possible for the child to safely return to the family's home.

*Id.* § 232.102(6) (emphasis added).

On September 21, 2015, the juvenile court entered its written dispositional order determining the children should continue to remain out of the mother's custody. The court stated "[t]he primary safety issue is unresolved drug issues and/or trafficking. The mother either knew or should have known about these issues." Additionally, the court explained:

> The children should remain in out-of-home placement. Placement outside the mother's home is necessary because a return to the home would be contrary to the child's welfare due to [DHS's] inability to ensure their safety as a result of unresolved drug issues in the mother's home. [R.J.] remains incarcerated.

Though the juvenile court's dispositional order is short and succinct, the order complied with the requirements of section 232.99(5) because the court filed the written order stating its reason for the disposition—the unresolved drug

issues in the mother's home. That it also found the mother had raised amazing children did not change its determination that currently the mother's home was not safe for the children. Similarly, its finding that the mother had made some progress did not change the determination that the home was still unsafe. We find on our de novo review the juvenile court, in its written dispositional order, made and filed its findings for the reason of its disposition as required by section 232.99(5).

The mother also challenges the court's findings, arguing the State did not establish by clear and convincing evidence that the children's custody must be transferred from her and its disposition was not the least-restrictive option. She asserts the main issue is the discord between her and DHS, and there was no evidence presented that the children would suffer from further adjudicatory harm if returned to her care. On our de novo review, we disagree on both points.

Accepting without deciding the mother does not presently have a substance-abuse problem, there is no serious or substantial doubt that illegal substances and controlled medications were found in her home, where her children lived, in a place they could access. Additionally, though she has established she had an old prescription for hydrocodone, her explanation as to how her prescribed medication wound up in R.J.'s prescription bottle for another medication—that police officers switched the medication—is simply not credible. But even assuming for the sake of argument that the mother truly had no knowledge that illegal substances were in and probably being trafficked from her home, she should be troubled that she allowed it to happen in her home where her children live. Cocaine residue was found in her home, along with marijuana,

packaging supplies and a scale, another person's controlled-substance prescription, and it is alleged her husband was selling heroin from the home. The mother should be working to protect her children from that situation ever occurring again and putting her children's safety first. She should be forthcoming and completely honest with her therapist and counselor. Instead, after her oldest child tested positive for cocaine, she looked for other possible reasons for the positive test.

Her testimony at the hearings demonstrates either her inability or her unwillingness to address the fact that illegal drugs *were* found in her home. Clearly illegal substances are dangerous to children, and even more so when they are in a place accessible by the children. Until the mother acknowledges illegal substances were found in her home and makes an effort to show she will protect her children from them, the State has shown the children cannot be safely returned to her custody. Since they cannot be returned to her custody, transferring custody to DHS was the least restrictive option available to the court to protect the children's safety. Consequently, we affirm the juvenile court's dispositional order.

### B. MMPI.

Finally, the mother challenges the court's requirement that she complete the MMPI. The trial court binder submitted on appeal shows the mother has already completed the test. An appeal "is moot if it no longer presents a justiciable controversy because [the contested issue] has become academic or nonexistent." *In re D.C.V.*, 569 N.W.2d 489, 494 (Iowa 1997) (citation and internal quotation marks omitted). Because the mother has already completed

the MMPI, we find the issue of whether the court erred in requiring her to complete it to be moot.  Consequently, we do not further address the issue.

**IV.  Conclusion.**

DHS, the State, and the juvenile court have a duty to protect children. Because the mother demonstrated at the dispositional hearing she was unable or unwilling to address the illegal substances found in her home and her children's access to them, as well as other drug issues, such as the hydrocodone found and her husband possibly selling heroin from the home, the State proved by clear and convincing evidence the children could not be safely returned to the mother's custody, and the court therefore selected the least-restrictive-dispositional option available to it.  Accordingly, we affirm the juvenile court's dispositional order continuing the children's removal from the mother's custody.

**AFFIRMED.**