**IN THE COURT OF APPEALS OF IOWA**

No. 25-0428
Filed July 23, 2025

**IN THE INTEREST OF C.B., C.B., C.B., and W.B.,**
**Minor Children,**

**A.B., Mother,**
    Appellant,

**E.B., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Decatur County, Monty Franklin (termination hearing) and Jordan Brackey (rulings on termination and new trial), Judges.

A mother and father separately appeal the termination of their parental rights. **AFFIRMED ON THE FATHER'S APPEAL; REVERSED AND REMANDED ON THE MOTHER'S APPEAL.**

Amanda Demichelis of Demichelis Law Firm, P.C., Chariton, for appellant mother.

Adam D. Hanson, Winterset, for appellant father.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

Ivan Miller, Red Oak, attorney and guardian ad litem for minor children.

Considered without oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

The juvenile court judge who presided over this extended child welfare proceeding passed away before he could enter a ruling on the State's petitions to terminate parental rights to four children. Months later, after a new judge had been appointed under Iowa Rule of Civil Procedure 1.1802(2), the children's mother moved for a new trial or to reopen the record. She argued that the judge would be "unable to make credibility determinations regarding the witnesses and parties" and that "substantial changes have occurred in the case" since the termination hearing. The judge denied the mother's motion and terminated the parents' rights under Iowa Code section 232.116(1)(f) and (h) (2023).

The mother and the father of the two youngest children separately appeal,[1] challenging each of the three steps in the termination analysis. The mother also claims the court abused its discretion in denying her motion for a new trial or to reopen the record. Because we agree with the mother's last claim, we reverse the juvenile court's ruling and remand for a new hearing on the petitions to terminate her parental rights. We affirm the termination of the father's parental rights.

## I.     Background Facts and Proceedings

More than three years ago, four children were removed from their parents' custody after their mother tested positive for methamphetamine. The father of the two youngest children was also reportedly using methamphetamine. The Iowa Department of Health and Human Services split the children between three homes,

---

[1] The fathers of the two older children, who were born in 2012 and 2017, did not appeal the termination of their parental rights. As a result, when we refer to "the father" throughout the rest of this opinion, we mean the father of the two youngest children, who were born in 2020 and 2021.

hours away from each other and their parents.[2]  The children were adjudicated in need of assistance in April 2022.

The mother and father almost immediately began participating in reunification services.  They each completed substance-use and mental-health evaluations and began participating in drug testing.  Although the mother tested positive for marijuana in June, she completed outpatient substance-use treatment by November.  The mother also attended counseling with a therapist she had been seeing since 2019.  The father tested positive for methamphetamine in June and October.  He completed an outpatient program in December and then entered inpatient treatment in February 2023.  The father finished that program in March and continued with outpatient treatment.  Unfortunately, he relapsed in November and struggled to reengage in substance-use treatment.

The mother, however, has abstained from methamphetamine since her positive test for that drug at the beginning of the case.  While she had some positive tests for marijuana throughout the proceedings, she later obtained a medical marijuana card.  The mother also continued participating in therapy, maintained full-time employment, and had stable housing appropriate for the children.  But the distance between the children's placements caused disruptions in the mother's visits, as did her refusal to work with service providers that she felt were biased against her.  While the father's visits with the two youngest children went well, a provider who supervised the mother's visits noted she was quick to yell at the

---

[2] Since then, the oldest child has been moved twice; the second oldest was moved once; and the youngest two children were moved five times, with a sixth move contemplated after the termination hearing.

children, didn't tell them "please" or "thank you," and sometimes seemed overwhelmed. The mother maintained that provider was lying about her observations and asked for her to be removed from the case. The department instead recommended a parenting assessment for the mother.

The assessment was completed in November. Although the evaluator observed the mother's "ability to be attuned to her children is limited by her ongoing depression and feelings of being overwhelmed," no safety concerns were noted. The evaluator warned, however, that "[a]ll of the children need a consistent adult or adults in their lives whom they can learn to depend on and trust." After receiving the assessment, the department recommended an extension of time for the parents at a review hearing in late November. The department's report noted, "At this time the concern with [the mother] is no longer a substance abuse concern but continuing to work with [her] on her parenting abilities."

The juvenile court granted a three-month extension, and the mother began semi-supervised visits with the children. But those visits required her to transport her four children from their three placements—a 656-mile roundtrip that took the mother all day and left her with about ten minutes to spend with the children outside of the car. A report from the department in February 2024 stated that "no concerns were noted" during the mother's visits with all four children, although those visits were inconsistent because of transportation barriers. The department recommended another extension to address those barriers and allow the mother to continue with her mental-health treatment.

But by March, the department had returned the mother to fully supervised visits because she was missing some of her visits and because the case manager

was unable to verify information from a substance-use evaluation the mother had recently completed.[3] From there, the mother's relationship with the department soured. She blocked the case manager's phone number and email address for about a month, which resulted in more missed visits with the children. The case manager's supervisor tried to meet with the mother and the case manager to improve their communication, but the meeting did not go well and ended with the mother yelling at the case manager to leave. Meanwhile, the father was missing drug tests and had not yet completed a new substance-use evaluation so that he could restart treatment.

Citing these issues, a report from the department in May recommended changing the permanency goal to termination. The juvenile court adopted that recommendation, and the State petitioned to terminate the parents' rights in early July. Just a few weeks before the termination hearing in August 2024, the department suspended the mother's visitation with the children after she got into an argument with the service provider that she had been asking to have removed for months. The provider claimed that when she told the mother not to talk to the children about coming to live with her, the mother "turned bright red and verbally exploded and started yelling." She told the provider, in front of the children, "to leave my fucking house," among other things. When the provider refused, the mother called the police. The provider, in turn, called her supervisor. The provider claimed that as she was making the call, the mother tried to grab the phone from

---

[3] The evaluation stated the mother had reported using marijuana "10 times a month for the prior 12 months." A letter from the substance-use counselor later clarified, "This should have stated 10 times total in the preceding 12 months."

her, so the provider pushed her. The mother claimed the provider "threw her hands up and . . . whacked/hit me with her phone." A police officer responded to the mother's call, but no criminal charges were filed.

The department's case manager cited that incident, as well as the mother's past combativeness with service providers, in support of her recommendation to terminate the mother's parental rights. She testified the "major concern" is that the mother is not in "good mental health, and that she is not able to fully handle all four children at once." The mother's only mental health diagnoses at that time were depression, anxiety, and post-traumatic stress disorder. As for the father, although his visits with the two youngest children went well, the case manager testified that he had "unaddressed substance abuse" issues, with inconsistent testing and treatment after his last positive test. The children's guardian ad litem agreed that termination was in the children's best interests, although the attorney for the oldest child argued against termination because the child wanted to return to his mother's custody.

The juvenile court judge who presided over the hearing took the matter under advisement, but he died in September before issuing a ruling. A successor judge was appointed under Iowa Rule of Civil Procedure 1.1802(2). In mid-February 2025, with no ruling from that judge, the mother filed a motion for a new trial or to reopen the record. She claimed that "substantial changes have occurred in the case regarding the mother and new evidence has come to light," including "changes to her parenting ability, her ability to remain sober and maintain her mental health and two of the children currently being moved from their prior placement and not having alternative permanency plan[s] for the children." The

mother argued the "ruling for [termination] is no longer timely and the Court would be unable to credibly rule . . . that the children were in desperate need of permanency," given the time that had passed since the termination hearing. And she contended the successor judge "has not had an opportunity to hear the evidence himself and is unable to make credibility determinations regarding the witnesses and parties in this matter." The State and the children's guardian ad litem resisted the mother's motion, while the father joined in the motion.[4]

The juvenile court denied the motion at the end of February, contemporaneously with its ruling terminating the parents' rights. Although the court apologized "for the delay in this critical decision," it reasoned that rule 1.1802(2) required the court to

> decide the case if it feels sufficiently informed to do so. After reviewing the files, this court does feel sufficiently informed to make such a decision. This decision is not one the court makes lightly. This court understands the best-case scenario would have been for the judge who observed the testimony to make the final decision. However, this court's review of that record makes [it] abundantly clear, more than anything else, that these children have been waiting very long for adults to make critical decisions regarding their future. They should not wait any longer.

On the merits of the termination petitions, the court concluded the State had met its burden. It terminated both parents' rights under Iowa Code section 232.116(1)(f) and (h). The mother and father each appeal.

## II.    Father's Appeal

Although the juvenile court stated the father joined in the mother's motion for a new trial or to reopen the record in those proceedings, he has not challenged

---

[4] We have been unable to locate anything in the record setting out the father's position. But the juvenile court's ruling stated the father had joined in the motion.

the denial of that motion on appeal. *See In re Marriage of Seyler*, 559 N.W.2d 7, 10 n.1 (Iowa 1997) (noting that a "party may waive due process rights and agree to have a successor judge decide the case"). Instead, the father focuses on the merits of the court's decision to terminate his parental rights.

We conduct a de novo review of that decision. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). In doing so, we use our familiar three-step framework that asks whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *Id.*; *see also* Iowa Code § 232.116(1)–(3). If all three steps support termination, we then consider any other issues the parent raises, like whether more time should have been granted. *See* Iowa Code §§ 232.104(2)(b), 232.117(5). Although the father has combined some of these steps in his petition on appeal, we understand from his arguments that he is challenging each step and asking for more time. But upon our de novo review of the record, we conclude that his claims should be denied.

On the first step, the father only contests the final common elements of Iowa Code section 232.116(1)(f) and (h),[5] both of which require clear and convincing evidence that the children cannot be returned to their parents' custody "at the present time." *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpreting "at the present time" to mean the date of the termination hearing). The court reasoned

---

[5] The differences between section 232.116(1)(f) and (h) involve the ages of the children at issue and the length of removal. *See In re M.B.*, No. 19-1884, 2020 WL 569649, at *2 (Iowa Ct. App. Feb. 5, 2020).

that while the father "made some progress toward reunification throughout the case," his substance use "was a recurring issue":

> There were times he did very well and was appropriately proud of his progress, but his very ill-timed relapse . . . led to several months of inaction in addressing his needs. [The father] also had another relapse in January of 2024. While [he] may recently have made efforts to re-engage in treatment, he let critical months go by without addressing these relapses.

We agree with the court about the father's commendable progress. He had stable housing, consistent employment, and no mental-health concerns. And the department had "zero concerns" about his visits, which were uniformly positive. But the father tested positive for methamphetamine several times during this case. His last positive test was in November 2023, and he admitted using methamphetamine again in January 2024. While the father had a negative test in May, he missed tests before that and did not consistently attend substance-use treatment. The father seemed to concede that he would need more time before the children could be returned to his custody, asking "for a three-month extension" at the termination hearing so that he could complete treatment. *See In re A.S.*, No. 22-1249, 2023 WL 382299, at *1 (Iowa Ct. App. Jan. 25, 2023) (concluding the father's concession that "he needed a few more months to be in a position to have the child returned to his custody . . . foreclosed reunification"). Sadly, we must agree with the court that the father's history of relapses and inconsistent participation in treatment after those relapses prevented the children's safe return to his custody. *See In re W.M.*, 957 N.W.2d 305, 313 (Iowa 2021) (concluding that the mother's "long history of substance abuse, repeated relapses, and

demonstrated inability to maintain sobriety outside a supervised setting" established the final element of section 232.116(1)(f)).

For the second step, the father passively argues without much analysis that termination is not in the children's best interests. Bypassing any waiver concerns with this argument, we agree with the juvenile court that "it is not in the children's best interest to suspend the crucial days of childhood while a parent experiments with ways to address their own problems." *See In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987) ("The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems.").

The defining elements of a child's best interests are the child's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011); *see also* Iowa Code § 232.116(2) (requiring the court to give "primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]"). By the termination hearing, the children had been removed from the father's custody for twenty-nine months. Just before the father was ready to progress to semi-supervised visits, he relapsed on methamphetamine. Because the father had not yet overcome his addiction after years of services, the juvenile court correctly found that terminating his parental rights was in the children's best interests. *See In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010) ("It is well-settled law that we cannot deprive a child of permanency . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.").

As for the third step, the father argues "that a permanent separation through termination would be detrimental to the children due to their age and their bond with him." This argument invokes the permissive parent-child bond exception in Iowa Code section 232.116(3)(c), which allows the court to avoid termination if there is "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting the "factors weighing against termination in section 232.116(3) are permissive, not mandatory" (citation omitted)). Like the juvenile court, we do not discount the father's strong bond with his children. But he did not "provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not" given the safety concerns at issue. *W.M.*, 957 N.W.2d at 315.

Finally, we agree with the court's denial of the father's request for more time. An extension is appropriate only if we can conclude "the need for removal . . . will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). The father argues that his "history not only shows a few relapses, but also demonstrates multiple successes as well," including his negative drug test in May 2024. We do not discount those successes. But the father had already been granted multiple extensions, during which he continued to use methamphetamine. And even though his drug test in May was negative, the father had still not fully reengaged in substance-use treatment. With this history, we find an extension was unwarranted. We accordingly affirm the termination of the father's parental rights.

### III.    Mother's Appeal

Like the father, the mother also challenges each of the three steps in our termination framework.  And she alternatively contends the juvenile court abused its discretion in denying her motion for a new trial or to reopen the record.[6]  We find this last claim—which we review for an abuse of discretion—to be dispositive.  *See Hunter v. Union State Bank*, 505 N.W.2d 172, 174 (Iowa 1993) (reviewing a motion for a new trial under what is now Iowa Rule of Civil Procedure 1.1802(2) for an abuse of discretion); *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019) (reviewing a motion to reopen the record for an abuse of discretion).

Iowa Rule of Civil Procedure 1.1802(2) states:

> In the event of the death . . . of a judge who has under advisement an undecided motion, or case tried without a jury, any other judge of the district may be called in . . . and, if by a review of the transcript or a reargument the judge can, in the judge's opinion, become sufficiently informed to render a decision, the judge shall do so; otherwise the judge may order a continuance, declare a mistrial, or order a new trial of all or any of the issues, or direct the recalling of any witnesses, or make such disposition of the matter as the situation warrants.

In interpreting its role under this rule, the juvenile court began with the premise that it was required to read the rule "with the strict obedience to language that the rules of civil procedure require."  From there, the court concluded the rule "places an obligation on the successor judge to decide a case on the review of the transcript (or reargument) if that judge feels he can become sufficiently informed to render a decision."  While the court acknowledged "there are some limitations

---

[6] Although the mother's motion cited Iowa Rule of Civil Procedure 1.1004(1) and (7) in support of her request for a new trial, the juvenile court analyzed the request under rule 1.1802(2).  We will do the same.

placed on a successor judge to resolve certain credibility issues, . . . there is case law that suggests that a court should not let this inability preclude a decision if one can be made." After reviewing the pleadings, exhibits, and transcript from the termination hearing, the court felt that it was sufficiently informed to render a decision, reasoning:

> A complete record was made at the hearing, and the parents and children were awarded a procedurally required hearing where their rights were respected. Their attorneys could present evidence. Their attorneys were able to cross-examine the witnesses of the State. All of this record was properly preserved via a court stenographer. This court reviewed all the evidence and the record, including every exhibit filed in the underlying [child-in-need-of-assistance] cases. While one may argue that the lengthy delay of this order mitigates the State and litigants' interest in a timely decision, this court finds that at the retrial, any successor judge would have to review the entirety of the case files due to [the prior judge] taking judicial notice of them. This additional review would delay things even further. Parties would avoid the time and expense of a second proceeding since this record is complete. Any appellate court tasked with reviewing this matter would find itself similarly situated in having to make a de novo decision without the benefit of live testimony.

We disagree for three reasons. First, "[t]his is a juvenile case in which the best interests of the children dictate that the rules of procedure be liberally applied in order that all probative evidence might be admitted." *In re J.R.H.*, 358 N.W.2d 311, 318 (Iowa 1984). Second, "when we say a case is reviewed de novo, this does not mean that we decide the case in a vacuum or approach it as though the trial court had never been involved." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). "To the contrary, while not bound by the district court's findings, we give them weight and defer especially where the credibility of witnesses is a factor in the outcome." *Id.* (cleaned up); *see also In re H.L.B.R.*, 567 N.W.2d 675, 679 (Iowa Ct. App. 1997) ("Where there is conflicting evidence on some issues, we

give consideration to the juvenile court on issues of credibility."). Third, the juvenile court's reasoning was based on *In re K.L.C.*, 372 N.W.2d 223 (Iowa 1985), which is distinguishable from the unique circumstances presented here, especially considering later decisions from our supreme court on the same issue.

In *K.L.C.*, a mother argued that she was denied due process when "the judge who presided at the termination hearing was not the same judge who issued the final termination." 372 N.W.2d at 226. The "crux of the mother's complaint," according to the court in *K.L.C.*, was "that the judge who decided her case did not view the witnesses." *Id.* "Without totally discounting the importance of having a fact finder present during the production of evidence, especially in passing on the credibility of individual testimony," the court concluded the mother had not been denied due process for several reasons:

> The State, as *parens patria,* along with other litigants in a juvenile termination proceeding, have a legitimate interest in having a child's future decided promptly without undue delay. As a fiscal matter, the litigants have a significant interest in avoiding the time and expense of a second proceeding when the first proceeding provides a record that is complete. As a practical matter every appeal causes a final decision to be rendered without personal contact with the witnesses. On appeal, we review parent-child terminations de novo, adjudicating rights anew. Finally, [the successor judge] followed authorized procedure to decide this case.

*Id.* at 226–27 (internal citation omitted).

In cases since *K.L.C.*, our supreme court has elevated the importance of credibility determinations in determining the proper procedure to be employed by a successor judge under rule 1.1802(2). For instance, the court in *Hunter* found a successor judge did not abuse his discretion in refusing to order a new trial because most facts were undisputed and "credibility was not that crucial to the

court's decision." 505 N.W.2d at 175. The court also agreed with the successor judge's reasoning that "[i]f I have to determine this case on who the trial court believes, that is a strong argument for having the trial court see those people and observe their testimony and weigh the conflicting stories by seeing them in life." *Id.* at 174–75. The supreme court built on that reasoning in *Seyler*, where it stated: "In a case where the resolution of a material issue requires a determination as to the weight and credibility of testimony, due process requires that the trier of fact hear all of the evidence necessary to make a meaningful evaluation." 559 N.W.2d at 9 (citation omitted). The court emphasized that "[i]n a child custody case where credibility of the witnesses is of paramount importance, due process requires that the deciding judge hear the evidence." *Id.* at 10.

Credibility was a key issue in determining whether to terminate the mother's parental rights. And that decision was a close call in our review of the record. The State was required to establish a nexus between the mother's mental health—the only remaining concern at termination—and an appreciable risk of adjudicatory harm to the children under Iowa Code section 232.102. *See In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016). But there was little evidence in the record about that nexus or the adjudicatory harm the children would suffer if returned to the mother's custody. Indeed, on appeal, the State supports the court's decision by simply arguing the children could not be safely returned to their mother because her visits "remained suspended at the time of the termination hearing." While the necessary progression of visits is a consideration in some cases, *see In re C.N.*, No. 19-1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020), here the parties disputed why the mother's visits did not progress.

Throughout the proceedings, the mother maintained that a service provider was lying about observations she made in reports about the mother's parenting. Yet the juvenile court credited those observations in its ruling. The court also resolved an important factual dispute at the termination hearing based on its conclusion that the mother was not credible. That dispute involved the mother's last visit before the termination hearing. After reviewing the mother's testimony about that incident, the court stated:

> Respectfully, this court gives little weight to [the mother's] testimony about the July 26, 2024 situation, as this court finds it minimized her participation and demonstrates little accountability for how it could impact her children. Obviously, this court could not view [the mother's] demeanor while she was on the stand. But this court can make credibility decisions based on the supporting evidence and lack of supporting evidence for a party's position. [The mother], no doubt, feels like she is justified in her actions. And there may have been ways in which [the] worker . . . could have de-escalated things herself. However, the evidence filed shows that [the mother's] story does not comport with others' accounts.

The court then reviewed that evidence, which it found to be credible, before concluding the mother "has not learned how to manage her emotions or handle conflict appropriately, even when her actions impact her children." That conclusion led the court to determine the State had met its burden to terminate the mother's parental rights under Iowa Code section 232.116(1)(f) and (h):

> With [the mother], the impediment to reunification no longer is her use of illegal substances. Instead, [she] continues to struggle with her mental health and her lack of ability to work with the providers to remedy the parenting deficiencies at the heart of this case. . . . Her repeated inability to control her emotions and her behavior resulted in a terrible situation that occurred in front of the children and impacted them greatly.

We do not find the record to be so clear. The reports from the provider who was part of the July incident with the mother are more negative than other

providers' reports. And while the accounts from the incident noted the children were crying, the case manager testified that she had only spoken to one of the children's therapists by the termination hearing, and that therapist had no opinion on whether the mother's visits should have been suspended. These, and other key factual disputes, made the juvenile court's decision to deny the mother's request for a new trial and to reopen the record unreasonable, especially considering the interests at stake. *See L.T.*, 924 N.W.2d at 526 ("In order to show an abuse of discretion, a party must show the juvenile court's action was unreasonable under the attendant circumstances."). Because the record is incomplete on these crucial credibility questions and lacking relevant evidence about the mother's situation in the six months between the termination hearing and the juvenile court's ruling, we cannot adequately assess the sufficiency of the evidence supporting the decision to terminate the mother's parental rights.[7] So we conclude the case must be remanded.

We share the juvenile court's concern with how long these children have been removed from their parents' custody and its desire to avoid adding to that time. *See In re T.R.*, 705 N.W.2d 6, 12 (Iowa 2005) ("[D]elays in termination of parental rights cases are 'antagonistic' to the child's best interest." (citation omitted)). But to serve the best interests of these children—some of whom have been moved from placement to placement throughout these proceedings—we conclude the court should have ordered a new termination hearing under

---

[7] The same credibility concerns are not present with our analysis of the court's decision to terminate the father's parental rights. Nor did the father claim in the juvenile court or on appeal that his situation had changed in the months after the termination hearing.

rule 1.1802(2) and considered the updated evidence the mother claimed was important to the court's decision, including "changes to her parenting ability, her ability to remain sober and maintain her mental health," and contemplated changes in the children's placements. *See L.T.*, 924 N.W.2d at 526 (finding the court abused its discretion in denying a motion to reopen the record where twenty months had passed since the original hearing and the new evidence "directly went to the concerns of the juvenile court").

## IV.     Conclusion

We affirm the termination of the father's parental rights. But under the unique circumstances present here, we reverse the juvenile court's ruling terminating the mother's parental rights and remand with instructions to grant her motion for a new termination hearing and to reopen the record.

**AFFIRMED ON THE FATHER'S APPEAL; REVERSED AND REMANDED ON THE MOTHER'S APPEAL.**

Chicchelly, J., concurs; Greer, P.J., specially concurs.

**GREER, Judge** (specially concurring).

I concur in the result and reasoning of the majority opinion. But, I point to a concern that continues to surface in cases we review. Importantly, the legislature requires that the Iowa Department of Health and Human Services (HHS) make reasonable efforts to help reunite families. *See* Iowa Code § 232.102(6) (2023) (providing HHS must make "every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"). Our supreme court has discussed the historical background behind this duty. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). The court noted:

> Our laws relating to the welfare of children have been driven for the last twenty-five years by policies and laws generally developed at the national level. Under the Adoption Assistance and Child Welfare Act of 1980, Public Law 96–272, 94 Statutes 500 (codified as amended in scattered sections of 42 U.S.C.), the concept of family preservation was established with a goal of reuniting children with their families after reasonable efforts by social services. Congress mandated services for families and children under the threat of ineligibility for federal matching funds to accomplish this goal. The reasonableness effort was conceived by Congress in part to ensure that prior to the expenditure of federal funds on foster care, reasonable efforts would be made to prevent out-of-home placement, and reasonable efforts would be made for unification following out-of-home placement. The requirement of reasonable efforts exists both to protect rights of parents and children, and provide financial incentive for states.
>
> Iowa responded with its own scheme of reasonable efforts by requiring the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." The concept covers both the efforts to prevent and eliminate the need for removal. The focus is on services to improve parenting. *However, it also includes visitation designed to facilitate reunification while providing adequate protection for the child.*

*Id.* (emphasis added) (internal citations omitted).  Thus, while we are to emphasize safety first for children, our state looks to make reasonable efforts to keep families together, including providing visitation.

In this case, the four children were split into three different homes at the time of removal over three years ago.  From that starting position—as the described in the opinion—"the oldest child has been moved twice; the second oldest was moved once; and the youngest two children were moved five times, with a sixth move contemplated after the termination hearing."  Additionally, at a time when the mother appeared to be progressing, her ability to visit the four children was impeded by the distance between her and the various placements.  As the majority notes, as the mother began semi-supervised visits with the children, her "visits required her to transport her four children from their three placements—a 656-mile roundtrip that took the mother all day and left her with about ten minutes to spend with the children outside of the car."  A report from HHS in February 2024 stated that "no concerns were noted" during the mother's visits with all four children although those visits were inconsistent because of transportation barriers.  But from there, the mother started missing visits and concerns grew over her mental health and parenting abilities.

I recognize that the mother has a responsibility to assist in making the changes necessary to reunite the family, and from my vantage point I cannot assess what caused the downward fall, but, the stress of being separated from the children by such an extreme distance, where the options for maintaining contact involves hours of driving with next to no significant time for connection, cannot be overstated.

In a perfect world, there would be specialty treatment centers that would focus on substance-use recovery while allowing parents to remain with their children and support the parent by addressing skills over the long-term. As this case illustrates, the current system—with the growing foster home shortage[8]and the limitations on resources—is not child-centered in its application.

---

[8] As reported by Iowa Public Radio:

> In 2024, there were more foster care kids who were referred to a home than there were licensed foster families in Iowa, according to Four Oaks, the state's contractor for licensing foster and adoptive parents.
>
> The nonprofit said [there] were 2,427 referrals for children needing a foster home and 1,734 licensed foster families in 2024.

Meghan McKinney, *Foster Youth Face the Possibility of Living in Shelters Due to a Lack of Foster Homes*, Iowa Public Radio (Mar. 27, 2025), https://perma.cc/35B9-8E38.