**In the Interest of J.S., A.L.F., III, and J.L.F., Minor Children,**

**Appeal of B.F. and A.L.F., II, Parents.**

No. 87–505.

Supreme Court of Iowa.

July 20, 1988.

Gary D. McKenrick of Gomez, May, McKenrick & Kelly, Davenport, for appellants.

Michael J. Motto, Davenport, for the children.

Thomas J. Miller, Atty. Gen., and Valencia Voyd McCown, Asst. Atty. Gen., for State.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and ANDREASEN, JJ.

ANDREASEN, Justice.

On March 9, 1987, the juvenile court terminated the parent-child relationship between B.F. (mother) and her daughter J.S., and between the parents B.F. and A.L.F. II and their two sons, A.L.F. III and J.L.F. We transferred this case to the court of appeals, which reversed the juvenile court's decree. On further review, we now vacate the court of appeals decision and affirm the decree of the juvenile court.

In July of 1984 the Department of Human Services (Department) became in-

volved with this family when twenty-three-month-old A.L.F. III was taken to an emergency room for removal of a fish hook from his finger. He was playing without supervision at the time of the injury. The Department provided services to the family on an informal basis until March of 1985 when a petition was filed alleging the three children were children in need of assistance under the provisions of Iowa Code section 232.2(5) (1983)[1].

On June 7, 1985, the juvenile court, after an adjudicatory hearing, found the children were children in need of assistance and ordered the Department to provide in-home services to the family. On October 30, 1985, the juvenile court, after a dispositional hearing, ordered legal custody of J.S. be transferred to the Department and that she be placed in the home of her natural father, C.S. The juvenile court also ordered legal custody of A.L.F. III and J.L.F. be transferred to the Department and that they be placed in foster care.

On January 3, 1987, a petition to terminate parental rights was filed. On March 9, 1987, the district associate judge, acting as a juvenile judge, filed an order terminating the parent-child relationship between J.S. and her mother B.F. and also terminating the parent-child relationship between A.L.F. III and J.L.F. and their parents A.L.F. II and B.F. pursuant to Iowa Code sections 232.116(5) & .117 (1987)[2]. The parents appeal the termination order. They assert that there was not clear and convincing evidence to support the juvenile court's termination order.

I. Iowa Code section 232.116(5) permits the juvenile court to terminate the parent-child relationship if the child has been adjudicated in need of assistance, has been placed out of the parent's custody for more than twelve months, and there is clear and convincing evidence that the child will suffer harm specified in Iowa Code section 232.2(6) if returned to the parent. *See In re K.L.C.*, 372 N.W.2d 223, 227 (Iowa 1985).

The types of harm specified in section 232.2(6) to include the physical abuse or neglect of the child, the harm caused by the parent's failure to exercise reasonable care in supervising the child, and the harm resulting from the parents being unable or unwilling to provide treatment needed to alleviate the child's emotional or mental disorders. Proof of any one of the types of harms delineated in section 232.2(6) is sufficient to support termination. *See In re K.L.C.*, 372 N.W.2d at 228.

■ Our review of proceedings to terminate a parent-child relationship is de novo. We accord weight to the fact-findings of the juvenile court, especially when considering the credibility of the witnesses the court has heard and observed first hand, but we are not bound by them. Our primary concern is the best interests of the child. We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

■ The State must prove the allegations of the petition to terminate by clear and convincing evidence. *See Santosky v. Kramer*, 455 U.S. 745, 770, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 617 (1982). This includes the requirement that before the court may terminate the parental rights there must be clear and convincing proof that the child will suffer harm in a manner specified in section 232.2(6). *See In re Chad*, 318 N.W.2d 213, 219 (Iowa 1982).

II. Extensive evidence was offered by the State at the termination hearing. The evidence included the testimony of witnesses, numerous written reports received as

---

**1.** Iowa Code section 232.2(5) (1983) has been renumbered to Iowa Code section 232.2(6) (1987).

**2.** Unless otherwise indicated, all references are to the 1987 Code.

exhibits, stipulations of counsel, and other matters taken by judicial notice. Caseworker Janine Johnson's testimony was based upon her observations and experience while working closely with the family both before and after the transfer of custody. Her testimony was supported by reports of other social workers, the statements of foster parents, and medical documentation. Doctor Sivan, a psychologist at the Child Development Clinic at the University of Iowa Hospital, testified as to the evaluation of each child made in the fall of 1986. Her opinions were based upon tests and observations she made of the children, her review of the results of the examinations and tests conducted by others, the reports of social workers, and her professional experience and knowledge.

The juvenile court also received the testimony of B.F., A.L.F. II, A.L.F. II's mother, and a close friend of the parents. Their testimony suggested that the children were normal, the parents cooperated with the Department, and the children had no serious injuries or other physical or mental problems. They denied the children had been physically abused, but could offer no explanation for the trauma indicated by the x-rays.

The record reflects contradictions between the testimony of witnesses called by the State and those called by the parents. The juvenile court identified credibility as a central issue in this case. The court stated:

> Either the social workers and other agents working with this family did everything possible to reintegrate the children into this home and the parents were hostile, volatile, uncooperative, refusing to change and refusing to acknowledge any fault in parenting; or the social workers and other agents were rude, aggressive, obstructive, predetermined to terminate parental rights, and acted in such a way to prevent these return of the children to the parental home.

It concluded the State's evidence was credible and the evidence presented by B.F. and A.L.F. II was not. It described their testimony as incredible, evasive, and selectively truthful.

III. The parents do not dispute their children have been adjudicated in need of assistance and have been placed out of their custody for more than twelve months. The determinative issue in this appeal is whether the State has established by clear and convincing evidence that the children will suffer harm as specified in Iowa Code section 232.2(6) if returned to the custody of their parents. We find the evidence sufficient to support termination of the parent-child relationship.

A. There is clear and convincing evidence that the children were physically abused or neglected. A.L.F. III was injured by a fish hook while playing without supervision. It was medically determined that he had a high-risk lead level which required medical attention. J.S. experienced bowel problems which required medical attention. The parents failed to keep medical appointments scheduled by the Department to provide the required medical attention. Based upon these facts and circumstances, the juvenile court found the children to be in need of assistance following an adjudicatory hearing in June of 1985.

Four months later, the juvenile court ordered that custody of the children be transferred to the Department because of additional facts and circumstances. Between June and November each child was examined and x-rays were taken and reviewed. Doctor Smith, Professor of Radiology and Pediatrics at the University of Iowa Hospitals and Clinics found unequivocal evidence of trauma to the left femur of J.S. (old injury). He was ninety percent certain that the x-ray of A.L.F. III disclosed an occult skull fracture which had healed without medical treatment. The x-ray of J.L.F. disclosed a fracture or severe trauma to the right elbow. All three children had been in the custody of B.F. and A.L.F. II. In the opinion of Doctor Smith the injuries must be considered child abuse unless they could be explained. The parents denied any knowledge of any of the children's injuries. The parents failed to follow through on

treatment prescribed for J.S.'s bowel problems. They also were unable to control the behavior of their children and treated the Department's suggestions with hostility.

At the October 1985 dispositional hearing, the juvenile court (not the same judge who conducted the termination hearing) found there was clear and convincing evidence that the children could not then be protected from physical abuse without transfer and removal from the parents' home, that continuation of the parents' custody would not be in the children's best interest, and that reasonable efforts had been made to prevent or eliminate the need for removal. There was no appeal from the district court order affirming the juvenile court's findings and order.

After custody was transferred to the Department, further examinations and evaluations were made of the children. The bowel problem which J.S. had experienced for more than a year while in B.F.'s custody cleared up while in the home of her biological father and stepmother. While in foster care both boys have exhibited fear of abuse by their parents. They also react negatively to their parental visitation.

B. There is clear and convincing evidence the children suffered harmful effects as a result of B.F. and A.L.F. II's failure to exercise a reasonable degree of care in supervising the children. Although the parents insist otherwise, the children were unsupervised or poorly supervised while in the parent's custody. The caseworkers made both scheduled and unscheduled calls at the parents' home and observed a lack of control and discipline. On several occasions a child was outside playing on the street while the parents' home was found locked. A.L.F. III was very aggressive and uncontrollable while in his parents' home. His behavior has improved while under foster care. J.L.F.'s behavior has also improved since he was placed under foster care.

C. There is clear and convincing evidence that both J.S. and A.L.F. III were harmed because the custodial parents were unable or unwilling to provide the required treatment needed to alleviate their emotional and medical disorders. All the children were evaluated at the Child Development Clinic or by the Child Psychology Department at the University of Iowa Hospitals and Clinics in Iowa City. At the time the Department became involved, J.S. was evaluated as functioning one-and-one-half years below her age level. A.L.F. III has received psychiatric treatment and, although he continues to be a challenge to control, his improvement has continued in his foster home. J.S. has demonstrated the more dramatic improvement. She was almost five years old when the Department placed her with her biological father and stepmother and did not communicate readily or show emotion. Approximately six months before, tests showed she was functioning mentally as a two-and-one-half year old. Eighteen months later, her social and emotion skills had reached a level commensurate with her age. She progressed in school to the point where she would soon be integrated with the regular classroom. She was described by the area education agency as "much happier, more secure and competent, a beautiful and well-behaved child who is a pleasure in the classroom." At the time custody was transferred to the Department, J.L.F. was one-and-one-half years old. He had difficulty communicating with others and would stay to himself. He exhibited violent temper tantrums. His behavior has improved while in foster care. He is comfortable in his placement.

IV. B.F. and A.L.F. II have not demonstrated significant progress since the children were removed from their home. The weekly supervised visits between B.F., A.L.F. II, and the children were so disruptive and had such a negative impact upon the children's behavior that the juvenile court ordered the visits reduced to one hour every two weeks. Although B.F. and A.L.F. II have attended parenting classes, they have not changed their attitude toward their parental responsibilities nor have their parenting styles or personalities changed. While they may love their children, they have been unable to accept the parenting responsibilities needed to provide a safe home for their children.

V. The children would suffer harm if returned to the custody of B.F. and A.L.F. II. It would not be in the children's long-range best interests to return them to the abusive and neglectful environment provided by B.F. and A.L.F. II. It was the opinion of Dr. Sivan, Dr. Schor, and social workers Janine Johnson and Kristin Crafton that the children would be in danger if returned to B.F. and A.L.F. II. They recommended termination of the parental rights. The attorney and guardian ad litem for the children ask that we affirm the juvenile court termination decree. We find clear and convincing evidence in the record to establish grounds for termination of the parental rights of B.F. and A.L.F. II.

DECISION OF COURT OF APPEALS VACATED; DECREE OF JUVENILE COURT AFFIRMED.