## IN THE COURT OF APPEALS OF IOWA

No. 17-0323
Filed June 7, 2017

**IN THE INTEREST OF C.C. and C.C.,**
**Minor Children,**

**K.C., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Appanoose County, William S. Owens, Associate Juvenile Judge.

A mother appeals from the juvenile court's permanency review order and grant of concurrent jurisdiction to the district court. **AFFIRMED.**

Amanda M. Demichelis of Demichelis Law Firm, P.C., Chariton, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Monte M. McCoy of McCoy Legal Services, Centerville, for father.

Debra A. George of Griffing & George Law Firm P.L.C., Centerville, for minor children.

Considered by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, Chief Judge.**

A mother appeals from the juvenile court's permanency review order and grant of concurrent jurisdiction to the district court.  Finding no reason to disturb the court's rulings, we affirm.

## I. Background Facts & Proceedings.

The children at issue are Co.C., born in February 2008, and Cl.C., born in August 2003.  This family came to the attention of the department of human services (DHS) when the district court provided a copy of the parents' September 2014 dissolution decree.  The decree outlined the court's concerns regarding domestic violence,[1] the parents' use of methamphetamine, the adequacy of the supervision of the children, and the well-being of the children while in the care of their parents.  There was an existing protective order prohibiting the father from contacting the mother.  The dissolution decree placed the children in the mother's legal custody and physical care.[2]  A child-abuse assessment was subsequently conducted by DHS, and the family began participating voluntarily with services in late 2014.

On March 20, 2015, the children were removed from the mother's physical care by ex parte order due to the mother's arrest on felony drug and theft charges.  A subsequent removal hearing placed the children in the father's

---

[1] According to the dissolution decree, the father was convicted of assault against the mother in June 2014, and of third-degree burglary and possession of a firearm in August 2014.  A criminal no-contact order was set to expire in June 2019.

[2] The decree states, in part:

> The parties agree that joint legal custody is not appropriate in this case, and that one party or the other should be awarded sole legal custody and primary physical care of the children.  Each party very much wants to be the parent awarded sole legal custody and primary physical care.

temporary legal custody and care, and the parents were ordered to participate in random drug testing. The mother was ordered to obtain a substance-abuse assessment and comply with all recommendations for treatment.

On April 9, following an uncontested hearing, the children were adjudicated children in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2015). The maternal grandparents' motion to intervene was granted as they had provided substantial care for the children in the past.[3] Temporary legal custody and placement of the children remained with father.

A May 28 dispositional order continued legal custody of the children with the father, with the goal that the children would return to the mother's custody.[4] The family was receiving numerous services to address the substance-abuse and domestic-violence concerns, including Family Safety, Risk, and Permanency (FSRP) services; substance-abuse screening; domestic-violence services; and parent partners. The father had completed a parenting program ("24/7 dads") and was participating in a batterers' education program (BEP). The children were engaged in individual counseling to deal with their emotional issues arising from the parents' discord and drug use.

An August 2015 review hearing was held. An August DHS report to the court noted, in part: "This case may be safely closed when [the mother] successfully completes substance abuse treatment, follows all professional

---

[3] A case plan notes, "Although their mother had legal custody of [the children] per the divorce decree prior to DHS involvement, she allowed the boys to stay with their grandparents the majority of the time."
[4] The mother appealed the adjudication and disposition but voluntarily dismissed that appeal.

recommendations, and resolves her criminal charges. [The mother and father] need to continue to cooperate with DHS and FSRP services." The juvenile court's review order noted that the court had been informed the mother had been arrested recently, was in jail awaiting a hearing, and had a plea proceeding scheduled that might result in her being placed at a halfway house facility.

The court also had before it the father's motion for concurrent jurisdiction. With regard to that motion, the court concluded:

> Although [the mother] has incurred additional criminal charges the department believes the permanency goal of returning the boys to her care and custody can still be achieved. The boys are indeed fortunate to have a father who is both capable and willing to serve as their primary care giver while [the mother] works toward regaining custody. If after a period of several more months it appears [the mother] will not be able to secure the boys' return to her home, this court would likely then make more permanent orders regarding the boys' placement with their father. However, until those decisions are made it would not be appropriate for this court to relinquish its authority to make a custody determination.

The juvenile court ruled the children were to remain in the father's care.

Another review hearing was held on December 3, 2015, and the court adopted the November case plan submitted by DHS. In the case plan it was noted that the mother needed to "continue to cooperate with DHS and FSRP providers"; the father had "successfully completed BEP, Children in the Middle, and attended Anger Management Counseling"; and the children were having supervised visits with their mother at the jail and semi-weekly visits with the maternal grandparents. The December review order noted the mother had "resolved her criminal charges and will be, or is in the half-way house." The court ordered the children to remain with their father, found the children's best interests

would not be served by granting the district court concurrent jurisdiction, and ordered a further review hearing "in the next six months."

A permanency hearing was scheduled for March 10, 2016.[5]  The March 2016 case plan update submitted by DHS recommended the children remain in the father's care and custody, concurrent jurisdiction be granted, and the permanency goal be changed to guardianship with other parent.  It was also noted the mother had completed a substance-abuse evaluation but had just begun substance-abuse treatment; the mother had completed orientation into Family Treatment Court and was participating in substance-abuse meetings and seeing a counselor.  It was recommended the mother successfully complete treatment and follow all professional recommendations and resolve her legal issues.

Due to continuances, the permanency hearing was held over several days in April and June 2016.  The mother sought additional time to seek reunification.  She reported she was living with her parents and working at a jewelry store.  DHS and the children's guardian ad litem (GAL) argued the children deserved permanency in the care of their father.

The GAL strenuously objected to returning the children to the mother.  In her permanency brief, the GAL wrote:

> 1. Whether Mother's substance abuse poses a risk to the children.
>     Mother testified on June 9, 2016, that at the time of her March 2015 arrest, that she was using methamphetamine daily at a rate of about half a gram per day.  Mother further testified that she was in denial of her drug abuse, despite several positive drug

---

[5] The code requires an initial permanency hearing within twelve months of removal.  *See* Iowa Code § 232.104(1)(a)(1).

screens, until she was again arrested and jailed for a duration, on or about September 1, 2015.

Mother also testified on June 9, 2016 that she has been over 280 days clean from substances, has completed treatment and is "recovered." She testified that in the past she was unable to quit because she used due to withdrawal symptoms but that being incarcerated kept her from using. She testified that she attends one meeting per week, but not always. Her mother testifies that she has often returned home late from the meeting, even close to midnight. Her testimony showed no knowledge of how to stay clean, what the 12 steps were, how to work the steps or the role of a sponsor in a recovering addict's recovery. While there is, at time of conclusion of evidence, no information that Mother has used since her release from incarceration in late February 2016, there is also no indication that Mother has internalized any tools that would cause her to stay clean. Mother testified that she plans to stay clean by staying away from people with whom she used, although she testified that she lives in the same home, engages in the same employment, and socially meets with people with whom she has used in their home. Relapse is a process, not necessarily an event. Mother is in a precarious position with her recovery.

2. Whether Mother's mental health poses a risk to the children.

Mother testified that she was a victim of domestic abuse. Social Worker Weldon testified that in conversations with mother about the effects of domestic abuse, that she believed that Mother should seek counseling for the after effects. Mother admitted a report on June 9, 2016, that was an evaluation for mental health therapy that stated that she was suffering from post-traumatic stress disorder due to the domestic violence, but that no therapy would be scheduled at this time. As with any evaluation for services, the report is consistent with the information provided by the subject and it appears that Mother is in denial about the effect of her mental health trauma upon her current mental health status, as Mother gives several inconsistent statements to the evaluator, including that she used methamphetamines only during her marriage and that Mother has court Monday "to determine whether her children are going to remain in the CINA system." Evidence . . . that Mother had not moved past the emotional trauma or enmity from the marriage was introduced several times including, Mother's attempt to have admitted an unintelligible audio tape kept on a cellular phone what mother purported was domestic abuse and evidence that Mother had followed [the father] and [Cl.C.] with her vehicle and sped away at a high rate of speed. Mother clearly shows enmity toward [the father] and has regularly put the children in the middle of that toxic relationship. While [the father] has in the past also put the children in the middle, he shows awareness of this

and a recent reduction in this action. In finding for a change in permanency from Mother to Father's custody, the Court in *In re N.M. and M.M.*, noted "Rather than thinking first of the children's need for a stable and secure home, [Mother] continues to use visitation as an opportunity to disrupt and undermine the children's relationship with [Father] and [Father's] family. [528 N.W.2d 94, 99 (Iowa 1995).] Social Worker Weldon and FSRP Provider Gail both testified as to a recent event where [the mother] used visitation as an opportunity to question a child as to whether a step-sibling in Father's home was using drugs, and then to report that as a concern that came from the child to Social Worker Weldon. Such manipulation for legal advantage is confusing to the child, who is put in the middle, and undermines the child's trust both in Father, the safety of their current home, and the juvenile court system. Mother's desire to "get" [back at the father] is interfering with her ability to put the children first and shows that she is not ready to parent them full time.

3. Whether Mother's criminal activity and/or incarceration poses a risk to children.

Mother was incarcerated from approximately September 1, 2015 until February 24, 2016[,] and was incapable of providing care during that time. Mother was incarcerated for criminal activity, which, while it may be categorized under incarceration or under [232.2(6)](c)(2), was a material factor in why Mother could not parent the children. Mother testified that she had sold drugs. Mother testified that [she] was convicted of drug charges and an offense related to untruthfulness. Mother testified that she was in denial of her criminal activity for many months. Mother testified that she was in denial of her substance abuse for many months. Mother testified that she was now "recovered." Mother testified that she did not need mental health therapy, although she admitted to Social Worker Weldon that she did. Mother is out late at night. Mother is driving erratically. There was a traffic stop of Mother during the time that she was actively using and engaging in criminal activity in which Mother was stopped in the wee hours of the night driving almost 100 miles per hour. Mother is prohibited from having weapons in the home. Mother has guns in the home. Mother is prohibited from having contact with offenders. Mother was written up in the halfway house for unauthorized contact. Mother owns property with [T.W.], a known drug user and violent partner with whom she and he had to be consequenced for communications in violation of their corrections agreement. Mother again, did not stop until it was brought to the court's attention on April 14, 2016, when she was "caught." After she had been consequenced, she resorted to lying, using her mother's name to send letters and photographs that Mother admitted she sent at [T.W.]'s request. Mother said she did not need verifiable employment for her corrections officer, and

he testified she did. Mother is exhibiting some of the same indications of lying and denial as when she was actively using and engaging in criminal activities. Whether this is mental health, or engaging in criminal activity or preparation to engage in criminal activity, Mother is engaged in the same deception and denial as created adjudicatory harms. These children cannot be returned to her care now.

4. Whether Mother is capable of exercising a reasonable degree of care.

Finally, Mother's substance abuse, criminal activity, history of domestic abuse, history of poor relationship choices, and emotional issues due to those life choices led her to come to the conclusion that the children would be better off in her parents' care much of the time. . . . The dental care which she provided those children caused them unnecessary pain and refusing pain medication from the hospital for clearly rotten teeth. Their Father has now met their dental needs, as well as physical and mental health needs. Also, the record showed that the children's grades have significantly improved since the children were placed with the Father. Neglect of the children's health and educational needs meets the definitions of adjudicatory harm under [232.2(6)](c)(2).

While Mother states that she is free from substances, has ceased criminal activities, is not in an abusive relationship, does not need mental health therapy, and can have the children return to her care, the record does not so reflect. Mother is out late at night. Mother has a relationship with a new man with a history of use. Mother is not in recovery for her emotional trauma from the marriage.

Time will tell if Mother continues in recovery. I hope she does. But taking a snapshot at June 9, 2016, the boys are not able to return home. Mother has not progressed beyond supervised visits. She only has three months of sobriety outside incarceration. She claims she is recovered. She continued to engage in manipulation and deception. She continues to have relationships with persons with whom she had toxic and criminal relationships. She stays out until midnight. She has not shown that she is considering the children first and that she can meet their needs.

The GAL asserted additional time was not warranted.

On July 18, the juvenile court entered its permanency order noting, in part:

The professionals who have been involved with the family since September 2014 acknowledge that both parents have a strong bond with the children, but there is a history of [the father] and [the mother] placing the children in the middle of their domestic discord. According to the testimony [the father] has taken steps to identify

when those situations begin to arise and is moderating his behavior. There continue to be concerns, however, with [the mother's] ability to set aside her animus toward [the father] when interacting with the boys. In fact, the FSRP providers testified their focus with [the mother] during visits is not in providing parenting instruction or protecting the boys' physical safety, but rather to intercede if [the mother] begins inappropriate conversations with the boys. All of the professionals currently working with the family testified that while there are no risks to the boys' physical safety there continue to be concerns regarding their mental and emotional safety. That being said, [the current DHS social worker and FSRP worker] both acknowledge that those issues could be resolved or at least diminished to a safer level with another six months of services.

The court allowed the mother "additional time to work toward reunification with the children," and specifically adopted

the steps sections and recommendations sections of the case plan filed March 8, 2016[,] as the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of a six-month period. Specifically, [the mother] shall continue participation in any after-care recommended as a result of her completed substance abuse treatment, continue participation in FSRP services, continue participation in family therapy, refrain from adult conversation with and around the children, participate in individual therapy as recommended, abstain from the use of illegal drugs and alcohol, and participate in random drug testing.

A permanency review hearing was set for October 2016.

In the interim, the children's relationship with the mother deteriorated. The children became reluctant to attend visits with their mother. The older child expressed frustration with and distrust of his mother. The mother sought permission from DHS to introduce the children to J.R., who the older child understood to be involved with the local drug culture. J.R. was arrested in September 2016. The car J.R. was driving on the date he was arrested belonged to the mother. Police learned from J.R. that the mother had spent the

night at J.R.'s home the night before he was arrested.[6]  Searches of J.R.'s house and the car J.R. was driving turned up drugs, drug paraphernalia, and a firearm. The mother claimed she did not know about J.R.'s involvement with drugs or weapons before his arrest, and she informed DHS and her children she was no longer involved with J.R. after his arrest.  However, the older child reported seeing her with J.R. thereafter.

The permanency review hearing was held on October 13 and December 1, 2016.  On February 17, 2017, the juvenile court entered its order.  We set forth some of the juvenile court's findings:

> 9. None of the professionals working with the family see that there would be any risks to the boys' physical safety were they returned to [the mother]'s home (though the fact that [she] was spending time—including overnight—with [J.R.] and that he was found to have syringes, methamphetamine residue and a loaded handgun are certainly concerning); however, there continue to be concerns regarding the emotional well-being of the boys should they be returned [the mother].
>
> 10. As recently as early October [Cl.C.] refused to attend a visit with [the mother] because he felt she had lied to him about her relationship with [J.R.]  [Co.C.] has expressed he will not attend a visit with his mother unless [Cl.C.] is also present because he does not feel "safe."  ([Co.C.] is unable to articulate what he means by "safe," but is adamant in not attending visits without his brother). [The mother] has at times had difficulty dealing with the boys' feelings regarding visits, but she did appropriately channel her disappointment over missing the visit in early October.  This may reflect that [the mother] is beginning to make the sorts of changes the professionals believe [the father] has already achieved.
>
> 11. [The social worker] reports the boys are settled at their father's home, enjoy living there, and are doing well.  [Cl.C.] has certainly made it quite clear he has made a life for himself . . . with his father and has no desire to return to his mother's home. Though he is five years [Cl.C.]'s junior, [Co.C.] also expresses that

---

[6] Even though one condition of her probation was to have the prior consent from her probation officer to sleep somewhere other than the home of her parents, the mother had not obtained the necessary permission.

he does not want to return to his mother's home. The [GAL] is vigorous in her support of the boys remaining with their father.

. . . .

13. It cannot be disputed that [the mother] has engaged in, and continues to participate in services directed for her by the juvenile court; however, on balance considering the recent circumstances surrounding [J.R.'s] arrest, [the mother]'s response to the arrest, her decision to continue her relationship with [J.R.], the obvious progress and stability the boys have achieved in their father's home, the lack of any concerns with placement with their father, the boys' desire to remain with their father, and the recommendation of the guardian ad litem the evidence fails to establish that it would . . . [sic][7] be appropriate to allow the children to return to the custody of their mother at this time pursuant to Iowa Code Section 232.104(2)(a).

The juvenile court concluded that in light of the "length of time the boys have been removed, the possibility they would suffer emotional harm if returned to [the mother], and the boys' credibly expressed preference that they want to remain with their father," "the long-term needs of the boys will best be met by allowing them to remain with their father." The court changed the permanency goal to "placement with other parent," placed the children in the father's legal custody, and granted concurrent jurisdiction to the district court.

The mother appeals.

**II. Scope and Standard of Review.**

We review permanency orders de novo. *In re A.A.G.*, 708 N.W.2d 85, 90 (Iowa Ct. App. 2005). We review both the facts and the law and adjudicate rights anew on the issues properly presented. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). We give weight to the juvenile court's findings, but we are not bound by them. *Id.* Our primary concern is the children's best interests. *Id.*

---

[7] This sentence contained a double negative, which in light of the ruling indicates this typographical error.

**III. Discussion.**

The mother argues the State has failed to meet its burden to show the permanency goal should be changed from reunification with the mother.[8] She contends the children could be returned to her at the time of the permanency hearing and the risk of emotional harm was not a recognized adjudicatory harm. She maintains the children's "[n]ot wanting to be removed from a current placement is not a valid argument" and the State failed to establish the children were in need of permanency. In response, the GAL and the State assert the State met its burden to transfer custody from one parent to the other under section 232.104(2)(d)(2). We agree.

Section 232.104(2) states the juvenile court's authority "[a]fter a permanency hearing" and allows these alternatives:

> (a) Enter an order pursuant to section 232.102 to return the child to the child's home.
> (b) Enter an order pursuant to section 232.102 to continue placement of the child for an additional six months at which time the court shall hold a hearing to consider modification of its permanency order. An order entered under this paragraph shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period.
> (c) Direct the county attorney or the attorney for the child to institute proceedings to terminate the parent-child relationship.
> (d) Enter an order, pursuant to findings required by subsection 4, to do one of the following:
> . . . .
> (2) Transfer sole custody of the child from one parent to another parent.

---

[8] Iowa Code section 232.104(1)(a), cited by the mother, sets the "time for the initial permanency hearing," which is to be held "within twelve months of the date the child was removed from the home." It is inapplicable to this case.

Pursuant to its authority under section 232.104(2)(d), the juvenile court determined the custody of the children would be transferred to the father.

We must determine whether that transfer was proper pursuant to the additional requirements of the section:

> Prior to entering a permanency order pursuant to subsection 2, paragraph "d", convincing evidence must exist showing that all of the following apply:
> (a) A termination of the parent-child relationship would not be in the best interest of the child.
> (b) Services were offered to the child's family to correct the situation which led to the child's removal from the home.
> (c) The child cannot be returned to the child's home.

Iowa Code § 232.104(4).

"The State on a permanency hearing needs only show the children cannot be returned by convincing evidence, not by both clear and convincing evidence." *In re A.D.*, 489 N.W.2d 50, 52 (Iowa Ct. App.1992). We bear in mind always that the children's best interests are paramount. *See* Iowa Code § 232.1.

Here, convincing evidence establishes—and all parties agree—that termination of the mother's parental right would not be in the children's best interests and that numerous and relevant services have been offered to this family since 2014, yet the same concerns noted by the GAL and workers expressed at the initial permanency hearing remain.

The mother did not acknowledge her active use of methamphetamine until her second arrest in September 2015. She failed to inform her workers of a June 2016 drug screen that tested positive until forced to do so. While we acknowledge the screen was disposed of before the mother could have it independently checked, we are more concerned with the continuation of the

mother's mindset that undermines continued sobriety. The same concerns expressed by DHS and the GAL at the initial permanency hearing—that the mother had not been able to set aside her animus toward the father and put the children's needs first, and had not "internalized any tools that would cause her to stay clean"—remained at the time of the permanency review hearing. The mother's lack of candor and her association with and defense of J.R. a month before the permanency review hearing are particularly troubling. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) (recognizing risk of unresolved drug dependency); *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) ("[W]e gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." (citation omitted)).

The mother contends there is no evidence to support the State's assertion that the children "need permanency." Chapter 232 itself declares children need permanency within a specified time frame. Section 232.104(1)(a) sets the time for the initial permanency hearing "within twelve months of the date the child was removed from the home." Under section 232.104(2)(b), the court may continue placement "for an additional six months," but to do so the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the home will no longer exist at the end of the additional six-month period." Thus, the legislature has determined children need permanency within eighteen months. *Cf. In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (stating in context of termination proceedings, "Iowa has built this patience into the statutory scheme

of Iowa Code chapter 232"). While we acknowledge that the mother has made progress, at the time of the permanency review hearing the children had been out of their mother's custody for more than nineteen months. The children were doing well in their father's care and custody, and both informed the GAL they wished to stay with their father.

The mother argues the children can be returned home at this time and the State failed to prove by clear and convincing evidence any adjudicatory harm. She relies upon Iowa code section 232.102(5)(a), which states, in part, that custody should not be transferred unless there is clear and convincing evidence that: "(2) The child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available." But we note the supreme court has recently illuminated the terms of "harm" and "harmful effects":

> Although chapter 232 does not contain a definition of "harmful effects," we have noted it "pertains to the physical, mental or social welfare of a child." *In re Wall*, 295 N.W.2d 455, 458 (Iowa 1980). Because of this broad definition, we have found such effects established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur. *See In re B.B.*, 440 N.W.2d at 597–98 (finding the State proved the parents' failure to exercise a reasonable degree of care when a child's lack of attendance at school "adversely affected his educational, social, and emotional development"); *In re J.S.*, 427 N.W.2d 162, 165 (Iowa 1988) (finding harmful effects as a result of a failure to exercise a reasonable degree of care in supervising children given that a child was playing outside on the street while the parents' home was locked and a child was "very aggressive and uncontrollable").

*In re J.S.*, 846 N.W.2d 36, 41–42 (Iowa 2014).

Here, the social worker testified the children would be at risk of emotional harm if returned to their mother. The children have been put into the middle of

the parents' conflict for many years, and the mother has not made much progress in recognizing its emotional impact on the children. Nor does she seem to recognize the impact her continued association with persons such as J.R. has on the children. We acknowledge the mother has been the victim of abuse in the past, but her transgression into the use of illegal drugs, involvement with J.R., and lack of honesty on occasion have slowed her progress. The oldest child especially had lost trust in his mother. The mother's claim that she could offer the children stability is not convincing where she testified she lived with her parents who were contemplating selling their house and leaving their business at which the mother was employed. Continued therapy between the children and the mother will help their relationship, but the time has come to change custody. We conclude the State has met its burden.

Moreover, in this case we also have the GAL's objection to a return of the children to the parent. Section 232.104(7) states:

> Subsequent to the entry of a permanency order pursuant to this section, the child shall not be returned to the care, custody, or control of the child's parent or parents, over a formal objection filed by the child's attorney or guardian ad litem, unless the court finds by a preponderance of the evidence, that returning the child to such custody would be in the best interest of the child.

The GAL objected to returning the children to the mother at the initial permanency hearing and continued to argue strenuously against returning the children to the mother at the permanency review. The juvenile court found that returning the children to the mother would *not* be in their best interest. We affirm the juvenile court's rulings in their entirety.

**AFFIRMED.**